IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

GARY SCHINAGEL and
PENNY SCHINAGEL, Husband and wife,

      Plaintiffs,

v.                                          No. Civ. 07-481 LH/RLP

THE CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
RUSSELL MOORE,
RAYMOND DEL GRECO,
LEE SPEER and JOHN DOES 1-15,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

      On March 11, 2008, Plaintiffs Gary and Penny Schinagel ("Plaintiffs") filed their First Motion for Summary Judgment on Count I of their Complaint for [] Fourth Amendment and New Mexico Constitution Article II, Section 10 Violations (Doc. 61). The Court, having reviewed the motion, briefs, evidence, relevant law, and otherwise being fully advised, finds that the motion should be granted in part and denied in part.

**I.**     **BACKGROUND**[1]

      On Tuesday, September 6, 2005, at approximately 11:20 p.m., Plaintiffs were dancing and listening to music completely undressed in each others arms within their family room and connected patio. Defs.' Resp. (Doc. 86), Statement of Undisputed Facts ("UF") ¶ 1 & Ex. A ¶ 3. Plaintiffs had both consumed alcohol that evening. *Id.* at UF ¶ 3.

---

      [1]The following facts are construed in the light most favorable to Defendants, the non-moving party. The Court has only considered facts supported by evidence in the record and did not consider any allegations, including those in Plaintiffs' introduction, that were not supported by the record.

At approximately 11:34 p.m., Albuquerque Police Department ("APD") Officer Russell Moore was on duty and responded to a loud noise complaint. Pls.' Mem. (Doc. 62), UF ¶ 1 & Ex. 1 at 15-16; Defs.' Resp., UF ¶ 4 & Ex. A ¶ 2. He had neither a search warrant nor an arrest warrant when he went to Plaintiffs' home that night. Pls.' Mem., UF ¶ 10. He had, however, previously received training on Fourth Amendment search and seizure law. *See id.* at UF ¶ 12.

When Officer Moore arrived in the area of the call, a man stepped out into the street and flagged him down. Defs.' Resp., UF ¶ 5. The man told Officer Moore that he was the person who had called the police and said his neighbors continually played loud music at all hours of the day and that it was an ongoing problem that he would like the police to address. Defs.' Resp., UF ¶ 6 & Ex. B at 15-16. Although he acknowledged not knowing what was going on right then at the neighbors' home, the man said the neighbors were always having parties in their backyard. *Id.* at UF ¶ 7. Officer Moore could hear the music from where he had parked down the street from the Schinagel's residence. *Id.* at UF ¶ 8. Officer Moore asked the man to return to his residence and indicated to him that he would report back once he was done making contact with the neighbors. *Id.* at UF ¶ 9.

Officer Moore then walked toward the residence in an easterly direction. *Id.* at UF ¶¶ 10, 15. He activated his belt tape. *Id.* at UF ¶ 14. As he approached the Schinagels' house, the volume of music was almost as loud as some of the loudest rock concerts he had heard. *Id.* at UF ¶ 11. Officer Moore saw three or four cars parked in the driveway. *Id.* at UF ¶ 17. On the east side of Plaintiffs' house next to the garage was a tall, solid wooden gate into the side yard that leads to the backyard and pool area. *See* Pls.' Mem., Ex. 1 at 57-60; Pls.' Reply (Doc. 104), Ex. 1. Officer Moore walked around the cars along the east side of the driveway to the gate that led to the side yard of the home to see if the music was coming from a backyard party, because the music was so loud

2

he thought it had to be coming from a source outside the residence.  Defs.' Resp., UF ¶¶ 18-20.

Officer Moore opened the gate and walked into the side yard to try to make contact with one of the residents.  *See* Pls.' Mem., Ex. 1 at 59-60; Defs.' Resp., Ex. A ¶¶ 14.  He believed he had the authority to enter the side yard without a warrant because it was exterior to the home, was being used for storage, and looked to be the only way to access the backyard.  *See* Pls.' Mem., Ex. 1 at 67-69.  He believed that if a resident is not living in the exterior space and the space is not a common area for residing in, then the area does not fall within the protections of the Fourth Amendment.  *See id.* at 68.

Officer Moore walked to a point just past the north end of the garage, but he did not walk the entire length of the side yard or into the backyard, because of the amount of spider webs and equipment stored in the side yard.  Defs.' Resp., Ex. A ¶¶ 15-16.  From the point where he was standing, he was about four feet from the home, but he could not see the layout of the backyard.  *See* Defs.' Resp., Ex. A ¶ 17 & Ex. B at 63 & Ex. B.  He attempted to detect voices, laughter, the smell of food, light, or other signs of a backyard party, but he did not detect any.  *Id.* at UF ¶¶ 27-28.  He then determined that the music was coming from inside the home and not from the backyard as he initially thought.  *Id.* at UF ¶ 29.  From where he stood, the windows on the east side of the house were covered or blocked, appeared to be closed, and no ambient light was coming from within the house, so he could not see into these windows.  *Id.* at Ex. A ¶ 20 & Ex. B at 62.  Officer Moore stood at this location for approximately a minute-and-a-half to four minutes, but he did not see the Schinagels at any time while he was in the side yard.  *Id.* at Ex. A ¶ 21 & Ex. B at 63, 139.  He did not knock on any of the east side windows because he was concerned he might break them by knocking loudly enough to be heard over the music.  *Id.* at Ex. B at 94-96.

Based on his observations, Officer Moore decided to try to contact the residents by going to

3

the front door.  *Id.* at UF ¶ 36.  He exited the side yard through the same gate and walked down the driveway to the door next to the garage.  *Id.* at Ex. A ¶¶ 23-24.  He noticed that there was a path along the south side of the home and the glass portion of the door by the garage was covered by blinds.  *Id.* at Ex. A ¶¶ 25-26.  Because he was not sure whether this was the front door, which was difficult to discern at night due to the way the house and landscaping were arranged, he decided not to knock and instead took the path along the south side of the residence.  *Id.* at Ex. A ¶¶ 27-28 & Ex. B at 95-96.  Walking along the path, he saw a putting green and stairs that led to a front door.  *Id.* at Ex. A ¶ 29.  Officer Moore walked to this door, rang the door bell a couple of times, and knocked once.  *Id.* at Ex. A ¶ 30.  He did not know whether the door bell worked, because he could not hear it.  *Id.*, Ex. B at 96-97.  After receiving no response but hearing the music volume increase and decrease, he went back to the driveway around the cars to the side gate, latched the side gate, again listened to confirm the music was coming from inside the home, and appraoched the door next to the garage.  *Id.* at Ex. A ¶¶ 31-35.

The door next to the garage had two doors: a glass security door that hinged on the left and an inside door that hinged on the right and swung inside.  Pls.' Mem., UF ¶ 6.  Although the inside door was made of glass, it was covered by a curtain that concealed the inside of the house.  *Id.*  Both doors were closed but unlocked.  *Id.* at UF ¶ 7.  Officer Moore opened the outer security door and, with his body, was "sort of elbowing or holding that door open."  Defs.' Resp., Ex. B at 114-15.  He then knocked loudly on the wood frame of the interior door.  *See id.* at Ex. A ¶ 35 & Ex. B at 96, 115.  After knocking, he heard dogs barking inside the home.  *Id.* at Ex. A ¶ 36.  He waited but did not get a response.  *Id.* at Ex. A ¶ 37.  He then turned the doorknob and, realizing that it was unlocked, he cracked the interior door open approximately 3-5 inches.  *Id.* at Ex. A ¶ 38 & Ex. B

4

at 49-50.[2]

Officer Moore decided to open the door in order to announce himself as a police officer, let the residents know the police were there, and try to get the residents to answer him.  *See id.* at Ex. B at 70-72.  He was also concerned that someone in the house might be in need of assistance, based on the loud music being turned up and down and his knowledge that many elderly people lived in the area.  *See id.* at Ex. B at 98-99.  Early in his career, an elderly woman could not get up, so she had alerted her neighbors by turning up the volume on the alarm clock next to her bed.  *Id.*  By opening the door, he felt he could hear better if someone inside needed help.  *See id.* at Ex. B at 70-72.  He felt that, based upon the circumstances, it was permissible under the Fourth Amendment to open the front door warrant a warrant.  *See* Pls.' Mem., Ex. 1 at 69-72, 138.

When Officer Moore opened the door, he saw dogs running inside.  Defs.' Resp., Ex. B at 115.  He then "leaned [his] body forward, not necessarily opening the door much farther, but [he] lean[ed his] body forward because the crack in the door only allow[ed him] so much view inside the house."  *Id.*  He then looked down the hallway towards the kitchen area where he saw Greg Schinagel, who was completely naked, step out from that way.  *Id.* at Ex. B at 115-16.  Mr. Schinagel then turned around and disappeared from Officer Moore's view.  *Id.* at Ex. B at 116.

Officer Moore, after seeing Mr. Schinagel, opened the door a little bit more so that he could get a better view, and he said, "Albuquerque police."  *Id.* at Ex. A ¶ 40 & Ex. B at 116-17.  Mr. Schinagel then reemerged with a towel around his waist, and he came towards Officer Moore hostilely at an elevated pace with his hand out in front of him.  *Id.* at Ex. B at 117.  At this point,

---

[2]Had the door been locked, Officer Moore could have continued to knock, ring the door bell, and wait.  Pls.' Mem., Ex. 1 at 50.  Another option available to him was to get on his radio and have dispatch call the telephone number for the residence.  *See id.* at 50-51.  He did not use this latter option prior to opening the doors to the Schinagels' home.  *See id.*

Officer Moore had not stepped across the threshold of the home.  *See id.* at Ex. A ¶ 41.  As Mr. Schinagel approached him, however, Officer Moore swung the interior door open while still standing outside the home and holding the storm door open.  *Id.* at Ex. A ¶ 43.

Officer Moore raised his hands up, and said, "hi."  *Id.* at Ex. B at 117.  Instinctively, Officer Moore stepped back a little bit as Mr. Schinagel rapidly approached him.  *Id.* at Ex. B at 118.  A brief verbal exchange took place in which Mr. Schinagel repeatedly asked Officer Moore if he had a warrant.  *See id.* at Ex. B at 117.  Officer Moore responded, "I have a law violation."  *Id.*, Ex. E.  Mr. Schinagel then told him to get his ass out of the house.  *See id.*  Because the dogs were running and barking at him, Officer Moore could not hear him, so he asked, "excuse me?"  *Id.* at Ex. A ¶ 45, Ex. B at 117-18, & Ex. E.   Mr. Schinagel threatened to break his nose if he did not get out of the house, and then he tried to push Officer Moore out of the door frame.  *Id.* at Ex. A ¶ 46 & Ex. E.  As Officer Moore tried to prevent Mr. Schinagel from pushing him back, Mr. Schinagel punched him in the face, knocking him backwards.  *Id.* at Ex. A ¶¶ 47-48.  Officer Moore immediately pushed Mr. Schinagel backwards into the den of the home, and Officer Moore followed him into the house, across the threshold, in an attempt to arrest him.  *Id.* at Ex. A ¶¶ 49-52.  Once inside, Officer Moore continued to struggle with Mr. Schinagel, during which time Ms. Schinagel physically attempted to prevent him from arresting her husband by jumping on Officer Moore's back.  *Id.* at Ex. A ¶¶ 53-54.

Officer Moore got control of Ms. Schinagel, handcuffing her and escorting her outside.  *Id.* at Ex. A ¶ 55.  Mr. Schinagel remained inside the home.  *Id.* at Ex. A ¶ 57.  Further events transpired that are not pertinent to this motion.

## II.    PROCEDURAL HISTORY

Plaintiffs filed a complaint against Defendants the City of Albuquerque, APD, Russell

Moore, Raymond Del Greco, and Lee Speer (collectively, "Defendants") for various claims, including a 42 U.S.C. § 1983 claim for unlawful and warrantless entry in violation of the Fourth Amendment in Count I.  Plaintiffs also alleged a claim for unlawful entry, excessive force, and unlawful seizure under article II, section 10 of the New Mexico Constitution in their proposed pretrial order.  The Court, in a Memorandum Opinion and Order (Doc. 113) entered on September 9, 2008, construed the proposed pretrial order as a request by Plaintiffs to amend their complaint to add the article II, section 10 claim.  Because Defendants assumed the cause of action had been pled and there was no prejudice to Defendants, the Court granted the request.  On September 12, 2008, Plaintiffs filed an amended complaint (Doc. 114) adding a claim under article II, section 10 for unlawful entry, excessive force, and unlawful seizure in Count VII.

Prior to the amendment, on March 11, 2008, Plaintiffs moved for summary judgment on Count I (Doc. 61), arguing that, even assuming events transpired as Defendant Moore averred, Defendant Moore violated Plaintiffs' Fourth Amendment and article II, section 10 rights in opening the wooden gate and entering their side yard and in opening the front doors to their home, looking inside, and opening the door wider when Mr. Schinagel approached.

Defendants initially respond that Count I of Plaintiffs' complaint refers to the "Individual Defendants", which includes Defendants Del Greco and Speer.  Defendants argue that Plaintiffs' motion does not assert any facts as to Officers Speer and Del Greco, and thus, the motion must be denied as them.  Plaintiffs' reply clarifies that their motion "addresses only the claims brought against Officer Russell Moore in Count I of Plaintiffs' Complaint." Pls.' Reply (Doc. 104) at 2. The Court will therefore not address Plaintiffs' claims in Count I against Defendants Speer and Del Greco.

Defendants also point out that Plaintiffs have asserted claims in Count I against Defendant

Moore not only for unlawful entry, but also for unlawful arrest and detention. Defendants argue that Plaintiffs' request for summary judgment on the unlawful arrest and unlawful detention claims should be summarily denied because they failed to allege any facts supporting these claims in their motion. Although Plaintiffs' motion requests summary judgment against Defendant Moore on Count I generally, Plaintiffs have only alleged facts pertaining to their illegal entry claims. Moreover, in their reply, Plaintiffs clarify that their motion contends that Defendant Moore violated their Fourth Amendment and New Mexico constitutional rights at two distinct times: when he breached their curtilage by going into their side yard and when he opened their front doors without a warrant. *See id.* Plaintiffs thus appear to have limited their summary judgment motion to the unlawful entry claim in Count I and are not seeking summary judgment on their unlawful detention and arrest claims. To the extent that Plaintiffs are seeking summary judgment on the unlawful detention and arrest claims asserted in Count I, the Court will deny the request for failing to establish sufficient facts demonstrating that they are entitled to summary judgment on these claims.

As to Plaintiffs' request for summary judgment on their unlawful entry claims against Defendant Moore, Defendants assume for purposes of this motion that Officer Moore's conduct violated Plaintiffs' Fourth Amendment rights. Defs.' Resp. at 21. Nevertheless, they contend that Officer Moore is entitled to qualified immunity, because the law was not clearly established in September 2005. Defendants also argue that § 41-4-12 of the New Mexico Tort Claims Act does not waive immunity for the article II, section 10 claim and that they are entitled to qualified immunity because Plaintiffs do not have a clearly established right to bring this claim.

## III.    STANDARD

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). The plaintiff must demonstrate that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the conduct. *Id.* As to the first inquiry, the question is whether the facts alleged, which are taken in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). The second inquiry is more specific than whether the officer's conduct violated a constitutional right; the question is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances he confronted. *Saucier*, 533 U.S. at 202. "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). In this case, there are two separate inquires: (1) whether a reasonable officer could have believed that entering the curtilage of the home through a wooden gate to investigate a misdemeanor noise violation without a warrant was lawful, in light of clearly established law and the information the officer possessed, and (2) whether a reasonable officer could have believed that opening the front door to the home to investigate a misdemeanor noise violation without a warrant was lawful, in light of clearly established law and the information the officer possessed. *See id.* (defining question as whether reasonable officer could have believed that bringing members of

9

media into home during execution of arrest warrant was lawful, in light of clearly established law and the information the officer possessed).  Moreover, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

If the plaintiff establishes both elements of the qualified immunity test, then the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.  *Nelson*, 207 F.3d at 1206.  Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party."  *Id.* (internal quotations omitted).  Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

## IV.    ANALYSIS

### A.    Fourth Amendment claim

The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const., amend. IV.    Physical entry of

10

the home is the chief evil against which the Fourth Amendment is directed. *Wilson v. Layne*, 526 U.S. 603, 610 (1999) (quoting *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972)). Warrantless searches and seizures inside a home are presumptively unreasonable. *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992). Absent exigent circumstances, the threshold of the home may not reasonably be crossed without a warrant. *Payton v. New York*, 445 U.S. 573, 590 (1980); *United States v. Bute*, 43 F.3d 531, 534 (10th Cir. 1994). The Supreme Court has recognized several types of exigent circumstances justifying a warrantless entry: hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police officers or other persons. *United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) (citing *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)). The Supreme Court and Tenth Circuit have made "quite clear that a warrantless search is reasonable only when it falls within one of the clearly defined exceptions to the warrant requirement." *Bute*, 43 F.3d at 534.

Plaintiffs argue that Officer Moore violated the Fourth Amendment when he entered the side yard and when he opened their front door. Defendants contend that it was not clearly established that either action constituted a search or that his actions were not permissible under the exigent circumstances or community caretaking exceptions. The Court will thus look at whether it was clearly established that each action was subject to Fourth Amendment constraints, and if so, whether it was clearly established that an exception to the warrant requirement did not justify entry.

### 1.    Entering the curtilage

A warrantless search is unconstitutional if the defendant has a legitimate expectation of privacy in the area to be searched. *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998). A defendant has a legitimate expectation of privacy in both the home and the curtilage of the home.

11

*Oliver v. United States*, 466 U.S. 170, 180 (1984). The curtilage is defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The protections afforded by the Fourth Amendment, however, do not extend to the open fields. *Id.* at 179-80. To determine whether an area is part of the curtilage or the open fields, a court looks at four factors: (1) the proximity of the area claimed to be curtilage of the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passers-by. *United States v. Dunn*, 480 U.S. 294, 301 (1987).

In this case, it is undisputed that the side yard into which Officer Moore entered was directly adjacent to the house and was used in part for storage. It is also undisputed that the side yard was enclosed by a high, solid wooden fence that obstructed a passerby's view and entry into the side yard. Finally, it is undisputed that the wooden gate was closed and that Officer Moore had to open the gate in order to access the side yard. All four factors of the *Dunn* inquiry clearly demonstrate that the side yard was within the curtilage of Plaintiffs' home. *Compare United States v. Hatfield*, 333 F.3d 1189, 1196-97 (10th Cir. 2003) (holding that marijuana that was in well-defined yard behind residence, in and among several small structures close to back of house, in area that could not clearly be observed from street was located in curtilage of home); *United States v. Reilly*, 76 F.3d 1271, 1276-78 (2d Cir. 1996) (area constituted curtilage where man-made barriers, including trees deliberately planted along perimeter, hedgerows, and partially fallen fence, combined with natural markers made it immediately apparent that area was private), *with United States v. Cousins*, 455 F.3d 1116, 1122 (10th Cir. 2006) (side yard area immediately adjacent to house was not within curtilage of home because side yard area was enclosed on only three sides, unenclosed side was

expected path one would take to get to side yard, unenclosed side is paved sidewalk, and no steps were taken to limit access to walkway).  The Court therefore concludes, as a matter of clearly established law, that Officer Moore was not free to enter the side yard without a warrant or without some recognized justification for a warrantless entry.  *See Hatfield*, 333 F.3d at 1198 ("Had Officer Harrold physically invaded the curtilage to make his observation, that would have constituted a search subject to the proscriptions of the Fourth Amendment.").

The Court recognizes that in some situations officers may walk around to the back door of a residence when attempting to conduct a "knock and talk" in an effort to contact a resident, unconnected with a search of the premises, when circumstances indicate the officers may find the resident there.  *See Alvarez v. Montgomery County*, 147 F.3d 354, 358-59 (4th Cir. 1998).  The primary cases relied upon for permitting entry into a backyard for such a "knock and talk" are distinguishable, however, as they all have in common the fact that the approach to the backyard was accessible to the general public and did not involve an obstruction like the high solid fence in this case.  *See*, *e.g.*, *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) (holding that sheriff did not interfere with defendant's privacy interest when he, attempting to serve civil process, went "unimpeded to the back of [defendant's] home to contact the occupants of the residence" through 10-foot opening in makeshift fence of debris that had no barrier in front of opening); *Alvarez*, 147 F.3d at 357-59 (sign depicting an arrow pointing to backyard directed passersby to "Party In Back" and there was no indication that backyard was enclosed by high fence in effort to obstruct entry by the public); *United States v. Garcia*, 997 F.2d 1273, 1279-80 (9th Cir. 1993) ("If the front and back of a residence are readily accessible from a public place, like the driveway and parking area here, the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling."); *United States v. Daoust*, 916 F.2d 757, 758-59 (1st

13

Cir. 1990) (permissible for police to go to backyard to interview resident where front door was inaccessible, but there was no evidence that backyard was enclosed by fence or other obstruction); *United States v. Anderson*, 552 F.2d 1296, 1298-1300 (8th Cir. 1977) (holding that agents permissibly entered backyard after knocking on front door and receiving no response when they saw light from house and heard dog barking and believed owner might be with dog, but there was no indication that backyard was enclosed by fence).[3]

In contrast, here the Schinagels had taken steps to create a reasonable expectation of privacy in their side yard by fencing off the area from the public with a solid wooden fence and gate that obstructed entry and visibility. Given that the Tenth Circuit has forbidden physical invasion of a home's curtilage where that curtilage is clearly defined and the residents had made efforts to limit access to the area, a reasonable officer would have known that he could not open a closed gate and enter the home's curtilage. *See Hatfield*, 333 F.3d at 1190, 1198 ("knock and talk" case in which

---

[3]Defendants also rely on the case of *Estate of Smith v. Marasco*, 430 F.3d 140 (3d Cir. 2005), for the proposition that entry into the curtilage was permissible. That case, however, was decided on November 30, 2005, after the events at issue here, and thus, should not be considered in the qualified immunity analysis. The Third Circuit, however, had issued a previous opinion in the same case in 2003, which can be considered in the analysis. *See Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) (hereinafter "*Smith I*").

In *Smith I*, the Third Circuit remanded the issue of the reasonableness of the officers' intrusion into Mr. Smith's backyard when responding to a complaint that Mr. Smith was shining a bright light into his neighbor's property, concluding that questions of fact remained as to whether the intrusion was justified. *See id.* at 502 & n.1, 521. The Third Circuit rejected the district court's "sweeping proposition" that officers may proceed to the back of a home when they do not receive an answer at the front door any time they have a legitimate purpose for approaching the house. *Id.* at 519-20. Instead, the Third Circuit found that fact issues remained because the district court had not discussed the layout of the property, and it was "unclear" "exactly how set off Smith's residence is from other properties, and there is no indication of **whether the officers followed a path or other apparently open route that would be suggestive of reasonableness**." *Id.* (Emphasis added). Consequently, at the time of the events here, the Third Circuit had noted the importance of whether the path to the back of a house is unobstructed in determining whether an officer can proceed to the back of a home to conduct a "knock and talk."

court noted that officer cannot invade well-defined curtilage).[4]

### 2.      Opening the front doors

By 2001, the Supreme Court had "made clear that any physical invasion of the structure of the home, by even a fraction of an inch, was too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (internal quotations and citations omitted). "In the home, . . . *all* details are intimate details, because the entire area is held safe from prying government eyes." *Id.*  It was therefore clearly established at the time that opening the door to the home constitutes a physical invasion of the home protected by the Fourth Amendment. *See id.* at 40 (holding that government's use of device not in general public use to explore details of home that would have been previously unknowable without physical intrusion is presumptively unreasonable search without warrant); *Payton*, 445 U.S. at 590 ("the Fourth Amendment has drawn a firm line at the entrance to the house"); *United States v. Flowers*, 336 F.3d 1222, 1228 (10th Cir. 2003) (noting that walls of home cannot be breached without a warrant or probable cause combined with exigent circumstances).  Defendants' argument that Officer Moore did not cross the threshold of the home until after Mr. Schinagel hit him thus does not help their cause, as it is undisputed that Officer Moore opened the door to the home and observed intimate details of the home's interior, including a naked Mr. Schinagel.  Because it was

---

[4]In analyzing whether it was clear that Officer Moore's action was reasonable, it is noteworthy that Officer Moore made no efforts to contact the residents prior to entering the curtilage.  Officer Moore confirmed that he did not ring the door bell, knock on the doors, or call Plaintiffs prior to opening the latched gate and entering Plaintiffs' side yard.  *See Bute*, 43 F.3d at 539 (explaining that warrantless entry of commercial property was not justified based only on suspicions due to open door where officer did not know about building's current use, he did not knock on door to see if anyone would answer, and he did not attempt to reach possible occupants of building by telephone).

clearly established that opening the door falls within the ambit of Fourth Amendment protections, Officer Moore needed either a warrant or an exception to the warrant requirement before he could open the door.

### 3.      Exceptions to Warrant Requirement

Because it was clearly established that Officer Moore's actions in entering the side yard and opening the front door were subject to Fourth Amendment protections and it is undisputed that Officer Moore did not have a warrant, Officer Moore's qualified immunity defense hinges on whether or not it was clearly established that an exception to the warrant requirement justified his actions. The cases cited by Defendants address two potential exceptions: the community caretaking exception and the exigent circumstances exception.

### a.      Community caretaking exception

The Supreme Court and Tenth Circuit have recognized a community caretaking exception to the warrant requirement. *See Cady v. Dombrowski*, 413 U.S. 433, 447-48 (1973); *Bute*, 43 F.3d at 535. Community caretaking functions are those that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441. The Tenth Circuit in *Bute*, however, expressly limited the community caretaking exception to "cases involving automobile searches." *Id.* The *Bute* court agreed with the Seventh Circuit that the "plain import from the language of [*Cady*] is that the Supreme Court did not intend to create a broad exception to the Fourth Amendment warrant requirement to apply whenever the police are acting in an 'investigative,' rather than a 'criminal' function" and that the Supreme Court "intended to confine the holding to the automobile exception and to foreclose an expansive construction of the decision allowing warrantless searches of private homes or businesses." *Id.* (quoting *United States v. Pichany*, 687 F.2d 204, 208-09 (7th Cir. 1982)). The Tenth Circuit thus

16

rejected the argument that the warrantless search of a commercial building based on an officer's suspicion of burglary and vandalism due to an open garage door was justified under the community caretaking doctrine.  *See id.* at 532-35.

In subsequent cases, however, the Tenth Circuit has expanded the community caretaking doctrine outside automobile searches to include situations when a citizen is briefly detained in a public place.  *See United States v. Garner*, 416 F.3d 1208, 1214 (10th Cir. 2005) (holding that officer properly exercised community caretaking function when he briefly detained man so fire department could examine him, where man was found lying in field next to apartment after caller informed police that man was unconscious); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 n.4 (10th Cir. 1997) (concluding that officers properly detained citizen pursuant to community caretaking function when they observed distraught man on public sidewalk at night who smelled of alcohol and was crying with hands over face).  In expanding the doctrine, the Tenth Circuit was careful to distinguish *Bute* because that case "involved the search of a building."  *Garner*, 416 F.3d at 1214.  This Court has found no Tenth Circuit case, and the parties have cited none, overruling the Tenth Circuit's holding in *Bute* that the community caretaking function does not pertain to searches of businesses and homes.

Defendants' citation to out-of-circuit cases does not infuse ambiguity in Tenth Circuit law. *See Loria v. Gorman*, 306 F.3d 1271, 1285-87 (2d Cir. 2002) (holding that officer was not entitled to qualified immunity defense based on Supreme Court and Second Circuit law, despite unsettled nature of law in other circuits).  Although there is no Tenth Circuit case involving warrantless entries when investigating loud noise complaints, the Tenth Circuit law is clear on when the community caretaking exception applies and, more importantly, when it does not.

The Honorable William Johnson, in a strikingly similar case in which officers entered a

17

home and fenced-in back yard when responding to a loud music complaint, concluded that the Tenth Circuit does not recognize a community caretaking exception to allow entry into a private home or curtilage. *See Roybal v. City of Albuquerque*, No. Civ. 05-1326 WJ/KBM, slip. op. at 3-5, 17-18 (D.N.M. Mar. 20, 2007). Although that case was decided after the events here and thus cannot be relied upon as constituting the clearly established law, its analysis and holding concerning what the clearly established law was in April 2005 in the Tenth Circuit is instructive. Judge Johnson, relying on the *Bute* decision, determined that in April 2005 it was clearly established in the Tenth Circuit that the community caretaking exception did not permit warrantless entry into a home or fully fenced backyard. *See id.* at 16-18. Judge Johnson further noted that "nothing in [the *Garner*] opinion created a grey area with regard to police officers entering a private home or the curtilage of a private home during the investigation of possible criminal activity, and the law remained clear that the community caretaking exception could not apply to such circumstances." *Id.* at 18 n.18.

For the foregoing reasons, the Court concludes that it was clearly established in September 2005 in the Tenth Circuit that the community caretaking exception did not permit Officer Moore to make a warrantless entry into Plaintiffs' home or curtilage.

**b.      Exigent circumstances**

In 2005, to determine whether exigent circumstances were present in a risk of personal danger case, the courts examined whether (1) the officer had reasonable grounds to believe that there was an immediate need to protect the lives or safety of themselves or others or their property or that of others; (2) the search was motivated by an intent to arrest or seize evidence; and (3) there was a reasonable basis, approaching probable cause, to associate the emergency with the place to be

searched.  *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2003).[5]  The exigent

circumstances exception to the warrant requirement is narrow and must be "jealously and carefully

drawn."  *Anderson*, 981 F.2d at 1567 (quoting *United States v. Aquino*, 836 F.2d 1268, 1270 (10th

Cir. 1988)).  The court must examine the circumstances as they would appear to a prudent, cautious,

and trained officer.  *Roska*, 328 F.3d at 1240.  An officer needs objectively reasonable grounds

giving rise to exigent circumstances based on something more than a generalized belief that such

circumstances might exist.  *See*, *e.g.*, *United States v. Davis*, 290 F.3d 1239, 1243-44 (10th Cir.

2002) (holding that warrantless entry into home during domestic disturbance call was not justified

by exigent circumstances because officers did not have reasonable, particularized grounds to believe

there was immediate danger to their safety; generalization that domestic violence calls are always

dangerous was not sufficient).

Defendants argue that Officer Moore acted in part out of concern that someone in the home

might be in need of assistance.  He based this belief on the fact that he heard the volume of the

music increase and decrease, start and stop; that Plaintiffs' neighborhood has a lot of elderly people;

and that early in his career an elderly woman had fallen and she alerted a neighbor by turning the

volume up on the alarm clock next to her bed as loud as she could.  The Court finds as a matter of

law, however, that Officer Moore did not have objectively reasonable grounds, beyond mere

speculation, to support his belief.  Officer Moore did not know whether elderly persons lived in the

Schinagels' residence.  Thus, the only fact particular to the situation to suggest an emergency was

---

[5]Since the Supreme Court issued its opinion in *Brigham City, Utah v. Stuart*, 547 U.S.
398, 404-05 (2006), holding that the subjective motivations of the officers are irrelevant, the
Tenth Circuit no longer considers the second factor.  *United States v. Najar*, 451 F.3d 710, 718
(2006).  The test is now a two-part test that considers (1) whether the officers have an
objectively reasonable basis to believe there is an immediate need to protect the lives or safety of
themselves or others, and (2) whether the manner and scope of the search is reasonable.  *Id.*

the increasing and decreasing of the music.  This fact alone is insufficient to indicate an emergency. *See Bute*, 43 F.3d at 539 (holding that suspicions roused by open door to commercial building at night fell short of objective, reasonable belief that emergency existed requiring immediate entry to building to prevent harm to building or its contents).  Moreover, the neighbor who made the loud noise complaint stated that the loud noise was an ongoing problem with the residence and that the residents were always having parties in their backyard, suggesting that the noise was not due to a medical emergency of an elderly person.

Although the loud noise was infringing on a neighbors' ability to enjoy his property in peace and tranquility, this fact does not qualify as an exigency immediately necessary to "protect" the neighbor's property.  The protection of property exception applies to protect property from threatened harm, not from a mere nuisance. *See Bute*, 43 F.3d at 538-39 (explaining that emergency purposes include aiding in fire-fighting, giving first aid, protecting persons or property from threatened harm, and the like) (quoting with approval *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)).  The Tenth Circuit has not recognized a nuisance such as loud noise to constitute an emergency within the meaning of the exigent circumstances exception.  To recognize loud noise as an "exigent circumstance" justifying a warrantless entry into a person's home, would undermine the Tenth Circuit's clear holding disallowing the extension of the community caretaking exception to buildings.

Moreover, the Supreme Court has held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).  "[A]pplication of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Id.*  A noise violation

20

constitutes an extremely minor offense that clearly did not create exigent circumstances.[6]  *Loria*, 306 F.3d at 1285-87 (concluding that no reasonable officer could have found exigent circumstances justifying warrantless entry because noise violation was "extremely minor" offense, involving only $25 fine, and there was no threat of violence).  *See also Burr v. Hasbrouck Heights Police Dept.*, 131 Fed. Appx. 799, 802-03 (3d Cir. May 17, 2005) (unpublished decision) (assuming that warrantless entry based merely on noise violation was not reasonable and violated Fourth Amendment rights, but finding that officer was entitled to qualified immunity because, unlike here, plaintiff did not cite any law placing officer on notice that his conduct was unlawful).

The out-of-circuit cases Defendants cite that rely on the exigent circumstances exception do not create a gray area in Tenth Circuit law.  In *United States v. Rohrig*, the Sixth Circuit held that a warrantless entry into a home by officers to abate an ongoing nuisance of loud and disruptive noise in a residential neighborhood late at night was reasonable under the Fourth Amendment.  98 F.3d 1506, 1524 (1996).  Although concluding that exigent circumstances justified the intrusion, the Sixth Circuit relied on the community caretaking function for its conclusion.  *Id.* at 1521.  The Sixth Circuit explained:

> [W]e believe that the *Welsh* analysis has less relevance as one moves away from traditional law enforcement functions and toward what the Supreme Court has referred to as "community caretaking functions." . . . Because the[ officers'] aim was not to track down a suspected violator of a local ordinance, we find it inappropriate to gauge the government's interest by looking only to that ordinance.
>
> Rather, by entering Defendant's residence for the limited purpose of locating and abating a nuisance, the officers sought to restore the neighbors' peaceful enjoyment

---

[6]Neither party provided the Court with the local noise violation ordinance.  The Court, however, takes judicial notice of the fact that the City of Albuquerque's Noise Control Ordinance, set forth in ch. 9, art. 9, § 1 *et seq.*, is punishable by a fine of $100 for the first offense, $250 for the second offense, and $500 for the third and subsequent offenses.  *See* City of Albuquerque, N.M., ch. 9, art. 9, § 99 (2001), at http://www.amlegal.com/albuquerque_nm/.

of their homes and neighborhood.  In view of the importance of preserving our communities, we do not think that this interest is so insignificant that it can never serve as justification for a warrantless entry into a home.

*Id.*  Unlike the Sixth Circuit, the Tenth Circuit has expressly refused to expand the community caretaking exception to commercial businesses, let alone residences where the privacy expectation is at its greatest.  Because Tenth Circuit law was clear that the community caretaking exception does not apply to residences, a reasonable officer in this circuit should have known that he could not make a warrantless entry based solely on a loud noise violation.

The case of *Radloff v. City of Oelwein*, 380 F.3d 344 (8th Cir. 2004), is also unavailing.  In *Radloff*, officers were dispatched to a home in reference to a call that juveniles were consuming alcohol at the address.  *Id.* at 346.  When they arrived, they could see a dozen people standing on the back deck, which was visible from the street, so they went to the back deck.  *Id.*  As one of the officers crossed the deck, he observed through a window a minor he recognized drinking beer inside the home.  *Id.*  The officers then entered the home to speak with the juveniles.  *See id.* at 346-47.  Unlike in *Radloff*, here there were no intoxicated minors present that created a public safety threat.  Although the Eighth Circuit also stated that it would have been unreasonable to subject the neighbors to the loud noise, as discussed above, it was clear that the Tenth Circuit did not extend the exigent circumstances exception to non-emergency situations, such as a mere noise violation, as to do so would eviscerate its holding that the community caretaking exception does not apply to buildings.

The case of *Galindo v. Town of Silver City*, No. Civ. 02-476 KBM/JHG, slip op. (Doc. 191) (D.N.M. May 15, 2003), in which the Honorable Karen Molzen concluded that the exigent circumstances exception allowed officers to enter a home without a warrant, is likewise distinguishable on its facts.  *Id.* at 17-18.  In *Galindo*, unlike in this case, the officers had

particularized reasons to suspect that juveniles might be in danger: the officers were aware that a minor had been missing for hours, that her parents had made several attempts over several hours to contact the people inside the home where they thought their child might be located, that this minor had been to this home on prior occasions and had come home intoxicated, and that two minors were lying down on a floor and sofa and could not be aroused by the officers' attempts to yell at them through the open patio door.  *See id.* at 2-3, 18.

Accordingly, because it was clearly established in the Tenth Circuit in September 2005 that the exigent circumstances exception only applies when there is an immediate need to protect the lives or safety of the officers or other persons or the officer's property or that of others, and Officer Moore did not have an objectively reasonable belief that such an emergency existed, Officer Moore is not entitled to the qualified immunity defense.

### B.       Article II, Section 10 Claim

Defendants argue that the qualified immunity defense shields them from Plaintiffs' state constitutional claim because Plaintiffs do not have a clearly established right to bring a cause of action based on a violation of article II, section 10.  As discussed in this Court's September 9, 2008 Memorandum Opinion and Order, the NMTCA does waive immunity and recognize a claim under article II, section 10.  Mem. Op. and Order (Doc. 113) at 7-10.  The Court also clarified in that opinion that the relevant inquiry when considering a qualified immunity defense is whether it was clearly established that the officer was violating a citizen's constitutional rights, not whether it was clearly established that a damages remedy was available to the citizen for a violation of those rights.  *Id.* at 11.  Assuming that the qualified immunity defense applies to state constitutional claims, the Court concludes that Officer Moore violated clearly established New Mexico constitutional law by entering Plaintiffs' side yard and home without a warrant when investigating the noise complaint.

23

1.      **Opening the front door and entering the curtilage implicated article II, section 10**

Article II, section 10 of the New Mexico Constitution provides:

> The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.

N.M. Const. art. II, § 10.  This provision, like its counterpart in the Fourth Amendment to the United States Constitution, states the "broad" right to be free from unreasonable searches and seizures. *State v. Gutierrez*, 116 N.M. 431, 444 (1993).  It "expresses the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusions." *Id.*  "Article II, Section 10 embodies the disparate values of privacy, sanctity of the home, occupant safety, and police expedience and safety." *State v. Attaway*, 117 N.M. 141, 151 (1994), *modified on other grounds by State v. Lopez*, 2005-NMSC-018, 138 N.M. 9.  The New Mexico courts have interpreted this provision as often providing "significantly greater protections than those afforded under the Fourth Amendment." *State v. Rodarte*, 2005-NMCA-141, ¶ 12, 138 N.M. 668.

The ultimate question in article II, section 10 cases is reasonableness. *Attaway*, 117 N.M. at 149.  Although the New Mexico courts have avoided bright-line, per se rules in determining the reasonableness of searches under article II, section 10, they have consistently expressed a strong preference for warrants. *State v. Paul T.*, 1999-NMSC-037, ¶ 9, 128 N.M. 360.  *See also State v. Gomez*, 1997-NMSC-006, ¶¶ 34, 39, 122 N.M. 777 (rejecting federal bright-line automobile exception to warrant requirement and requiring particularized showing of exigent circumstances to justify warrantless search of automobile); *Attaway*, 117 N.M. at 150 & n.6 (emphasizing court's "strong belief in the protection of individual privacy and in the reasonable execution of warrants"

in holding that knock and announce rule is critical component of reasonable search guaranteed by article II, section 10).

Warrantless searches and seizures inside a home are presumptively unreasonable, absent a few narrowly defined exceptions. *State v. Ryon*, 2005-NMSC-005, ¶ 23, 137 N.M. 174. New Mexico has expressed a "strong preference for warrants" for all searches. *Id.* (quoting *Gomez*, 1997-NMSC-006, ¶ 36). Moreover, the New Mexico Court of Appeals has indicated that the use of the term "homes" in article II, section 10, rather than the term "houses," as in the Fourth Amendment, "is some evidence that the state constitutional provision may be interpreted to provide broader protection than the federal." *State v. Sutton*, 112 N.M. 449, 455 (Ct. App. 1991). In New Mexico, to determine whether a person had a reasonable expectation of privacy in the area searched, the court must look at whether the person had exhibited an actual expectation of privacy and whether the expectation is one that society is prepared to recognize as reasonable. *See State v. Chort*, 91 N.M. 584, 585 (Ct. App. 1978) (quoting *Katz v. United States*, 389 U.S. 347 (1967)). Important factors are whether the person erected any substantial fences around the plots and whether the officers were able to walk up and view the plots unimpeded from a public road. *See Sutton*, 112 N.M. at 455.

For the same reasons as discussed above, and especially in light of the greater privacy protections afforded by the New Mexico Constitution, it was clearly established that Plaintiffs had a reasonable expectation of privacy in their home. *See Ryon*, 2005-NMSC-005, ¶ 23. They also had a similar privacy expectation in their side yard, which was surrounded by a high solid fence that obstructed view from the public. *Cf. Chort*, 91 N.M. at 585 (holding that defendant had reasonable expectation of privacy in garden plot surrounded by solid five-foot fence located in ten-acre tract on which he lived). Officer Moore thus needed a warrant or an exception to the warrant requirement to negate Plaintiffs' expectation of privacy in their home and side yard.

### 2.      No exception to warrant requirement justified intrusion

The community caretaker exception applies when police are acting out of a desire to aid victims rather than investigate criminals. *Ryon*, 2005-NMSC-005, ¶ 25. The New Mexico courts, however, guard with careful vigilance intrusions into the privacy and sanctity of the home, permitting them only in carefully thought-through and clearly justifiable circumstances. *Id.* ¶ 19. To determine whether the community caretaker exception justifies a warrantless search or seizure, the court must balance the public interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen. *Id.* ¶ 24. "As the privacy expectation increases, the caretaker functions that justify an intrusion by police must be judged by a different standard." *Id.* ¶ 25.

Three distinct doctrines fall within the community caretaker exception: (1) the emergency aid doctrine, (2) the automobile impoundment and inventory doctrine, and (3) the community caretaker doctrine established in *Cady*. *Id.* New Mexico generally limits the *Cady* community caretaker doctrine to vehicles or public highways. *See id.* ¶ 26. In contrast, the emergency aid doctrine applies to, but is not limited to, warrantless intrusions of personal residences. *Id.* Because the intrusion here was into Plaintiffs' home and its curtilage, only the emergency assistance branch of the community caretaker doctrine is implicated. *See id.* ¶ 26.

The emergency aid doctrine, however, is limited to the functions of protecting or preserving life or avoiding serious injury. *Id.* (quoting *Laney v. State*, 117 S.W.3d 854, 861 (Tex.Crim.App. 2003)). "Since the privacy expectation is strongest in the home only a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge." *Id.* The motivation for entry of a home without a warrant or probable cause "must be a strong sense of an emergency." *Id.* ¶ 27. For the emergency assistance doctrine to apply, (1) the police must have

26

reasonable grounds to believe there is an emergency that creates an immediate need to protect life or property; (2) the search must not be primarily motivated by an intent to arrest and seize evidence, and (3) there must be a reasonable basis, approximating probable cause, to associate the emergency with the place to be searched. *See id.* ¶ 29. Factors in determining whether an emergency exist include the purpose and nature of the dispatch, the exigency of the situation based on the known facts, and the availability, feasibility, and effectiveness of alternatives to the intrusion. *Id.* ¶ 32.

Similarly, the exigent circumstances exception applies in situations requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. *State v. Duffy*, 1998-NMSC-014, ¶ 70, 126 N.M. 132 (quoting *State v. Copeland*, 105 N.M. 27, 31 (Ct. App. 1986)). The officer's belief as to whether exigent circumstances exist must be reasonable, based on the judgment of a prudent, cautious, well-trained officer. *See id.* The presence of exigent circumstances must be supported by specific articulable facts. *Id.* The distinction between the exigent circumstances exception and the emergency assistance doctrine is that the exigent circumstances exception "applies when police are engaged in crime-solving activities, searching for evidence or suspects." *Ryon*, 2005-NMSC-005, ¶ 26 n.4. For the exigent circumstances exception, officers must have probable cause in addition to exigent circumstances. *Id.*

In this case, Officer Moore's purpose of arriving at the home to investigate the noise complaint could be construed as either a community caretaker function, to help the tranquility of the neighbors, or as a crime-solving activity, to investigate the offenders of the noise ordinance. Regardless of how Officer Moore's dispatch is categorized, a reasonable officer could not have believed that either exception permitted intrusion into Plaintiffs' home and curtilage under the facts of this case, because a noise violation does not constitute a danger to life or serious damage to

27

property sufficient to meet New Mexico's definition of a genuine emergency and overcome the strong privacy expectations in the home. *See id.* ¶ 31 (explaining that emergency aid doctrine requires "an emergency, a strong perception that action is required to protect against imminent danger to life or limb, an emergency that is sufficiently compelling to make a warrantless entry into the home objectively reasonable under the Fourth Amendment"); *Duffy*, 1998-NMSC-014, ¶ 70 (exigent circumstances exception applies when swift action is needed to prevent imminent danger to life or *serious damage* to property).  Officer Moore's theoretical concerns that an elderly person may have been incapacitated inside the residence also were too speculative to allow a warrantless entry. *Cf. Ryon*, 2005-NMSC-005*,* ¶¶ 40-43 (holding that emergency aid exception did not apply where deputies knew stabbing suspect who was possibly wounded might have headed to his home, door to home was slightly ajar with light on inside, and no one answered officers' knock and calls). Morever, Officer Moore's failure to take alternative measures prior to the intrusion indicates the unreasonableness of his actions.  Officer Moore did not attempt to contact the residents in any way before entering the curtilage.  Although he knocked before opening the front door, he did not attempt any other methods of contacting the homeowners, like calling their phone number.  He also could have knocked, rang the doorbell, or loudly announced his presence during the times when the music volume was low or in between songs.  For all the foregoing reasons, the qualified immunity defense is not applicable under the facts of this case.

**V.     CONCLUSION**

Based on the facts as construed in the light most favorable to Defendants, Officer Moore violated clearly established Fourth Amendment and New Mexico constitutional law by entering the side yard and opening the front door to Plaintiffs' home without a warrant and in the absence of an emergency or other exigent circumstances.  Officer Moore is therefore not entitled to qualified

immunity on Plaintiffs' unlawful entry claims brought under the Fourth Amendment and article II, section 10 of the New Mexico Constitution.  Plaintiffs' motion for summary judgment on their unlawful entry claims brought against Officer Moore under the Fourth Amendment and article II, section 10 of the New Mexico Constitution will therefore be granted.


**IT IS THEREFORE ORDERED** that Plaintiffs' First Motion for Summary Judgment on Count I of their Complaint for [] Fourth Amendment and New Mexico Constitution Article II, Section 10 Violations (Doc. 61) should be **GRANTED** in part and **DENIED** in part as follows:

1.      Plaintiffs' motion for summary judgment on their unlawful entry claims against Defendant Moore brought under the Fourth Amendment and article II, section 10 of the New Mexico Constitution is **GRANTED**;

2.      Plaintiffs' motion is **DENIED** in all other respects.


SENIOR UNITED STATES DISTRICT JUDGE