**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

GARY SCHINAGEL and
PENNY SCHINAGEL, Husband and wife,

      Plaintiffs,

v.                                                                No. Civ. 07-481 LH/RLP

THE CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
RUSSELL MOORE,
RAYMOND DEL GRECO,
LEE SPEER and JOHN DOES 1-15,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

On March 11, 2008, Defendants Russell Moore, Raymond Del Greco, and Lee Speer filed

a Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Illegal Entry, False Arrest,

Malicious Prosecution, and Defamation Claims, and Plaintiff Penny Schinagel's False Arrest Claim

(Doc. 67). The Court, having reviewed the motion, briefs, evidence, relevant law, and otherwise

being fully advised, finds that the motion should be granted in part and denied in part.

**I.      BACKGROUND**[1]

On September 6, 2005, at approximately 11:20 p.m., Plaintiffs Gary and Penny Schinagel

were dancing and listening to music completely undressed in each others arms within their family

room and connected patio. Defs.' Mot. for Partial Summ. J. No. I (Doc. 67) ("Defs.' MSJ I"),

---

[1]The following facts are undisputed or, if disputed with admissible evidence, are
construed in the light most favorable to Plaintiffs, the non-moving party. Plaintiffs dispute a
number of facts without addressing them or controverting them with specific evidence. The
Court has deemed admitted those facts not disputed with admissible evidence. *See* Fed. R. Civ.
P. 56(e)(2); D.N.M.LR-Civ. 56.1(b).

Undisputed Fact ("UF") ¶ 1.  Albuquerque Police Department ("APD") Officer Russell Moore was dispatched to the Schinagels' home in response to a loud noise complaint made by a neighbor.  *Id.*, UF ¶ 2.  In the course of investigating the complaint, Officer Moore entered the Schinagels' side yard and peered into their window.  *See* Pls.' Resp. (Doc. 87), Ex. 2 at 16.  Penny Schinagel saw him, yelled at her husband that they had a peeping tom, and ran into the bathroom to put on her clothes.  *Id.*  Officer Moore subsequently left the side yard, opened the front doors to their home, and entered the kitchen of their home.  *See id.*, Ex. 3 at 72-73, 114-16 & Ex. 4 at 51.  When Gary Schinagel confronted Officer Moore, a physical altercation ensued.  *See id.*, Ex. 4 at 51, 96-101.  Officer Moore struck Mr. Schinagel in the head with a flashlight twice, tackled him, and then maced him.  *Id.*, Ex. 4 at 96-101.  Mr. Schinagel never punched Officer Moore.  *Id.*, Ex. 4 at 79.

During the altercation, Officer Moore handcuffed Penny Schinagel and escorted her outside the home.  Defs.' MSJ I, UF ¶ 5.  Gary Schinagel remained inside the home and locked the door. *Id.*, UF ¶ 6.  Officer Moore radioed for backup assistance from other officers.  *Id.*, UF ¶ 4.  He advised over the police radio that he had been battered or punched in the face by a male occupant inside the residence.  *Id.*, UF ¶ 7.

Officer Chris Juarez[2] responded to Officer Moore's call for assistance.  *Id.*, UF ¶ 8.  Upon arrival, he saw Officer Moore standing on the sidewalk with a female in custody.  *Id.*, UF ¶ 9. Officer Moore told Officer Juarez to start setting up a perimeter around the house.  *Id.*, UF ¶ 10.  He also told him that Gary Schinagel had punched him in the face and was inside the home.  *Id.*, Ex. B at 20, 24.  Officer Moore did not tell Officer Juarez why he was at the Schinagels' house, but Officer Juarez already knew from the dispatch notification on his computer that it was a loud music

---

[2]Officer Juarez is not a defendant in this suit.

2

call. *Id.*, UF ¶ 11.  Officer Juarez then positioned himself behind a truck that was parked in the driveway where he could see the doorway. *Id.*, UF ¶ 13.  He stayed there until more officers arrived on scene. *Id.*, UF ¶ 14.

Officer Lee Speer soon arrived in response to the assistance call. *Id.*, UF ¶¶ 8, 15.  He approached Officer Moore who stated that he was investigating a noise complaint and got into a fight with a female who was now in the back of the police car and a male who barricaded himself inside the house. *Id.*, UF ¶ 15.  Officer Speer noticed a red mark on Officer Moore's face that was consistent with being punched. *Id.*, Ex. C at 16-17.  When other officers arrived three to four minutes later, Officer Moore explained to the group of officers the following: he had been dispatched to the area to investigate a noise complaint; after several minutes of trying to contact the residents of the home by knocking, a male, who appeared intoxicated and belligerent, answered the door; the male struck Officer Moore and they ended up fighting with each other, at which point the female jumped on his back. *See id.*, UF ¶¶ 16-17.  Officer Moore did not mention whether he had seen people in the house before the male came to the door. *Id.*, Ex. C at 21.  He also did not state whether he had opened the door to the house before he made contact with the male. *Id.*, UF ¶ 20.  Officer Speer's understanding was that Officer Moore stood outside the door to the home and Mr. Schinagel came and opened the door. *Id.*, UF ¶ 21.

After Officer Moore briefed them, the officers devised a quick tactical plan to surround the house, contain the person inside, and then work on getting an arrest plan in place. *Id.*, UF ¶ 22.  Officer Speer and Officer Juarez were to go toward the front of the house using the vehicles in the driveway for cover while other officers positioned themselves to the rear of the residence in case Mr. Schinagel fled out the back. *Id.*, UF ¶ 23.  Sergeant Montano was to call the home and try to talk Mr. Schinagel into exiting, but he never got the opportunity to do so. *Id.*, Ex. C at 22.

Meanwhile, Gary Schinagel was in his house trying to gain his senses when he became concerned about his wife, *see* Pls.' Resp., Ex. D at 140, so he went to the door and saw officers who were saying, "Get out here, come out here," Defs.' MSJ I, UF ¶ 25.  When Mr. Schinagel came to the threshold, he stuck his head out of the door, but kept his left hand on the door knob while his right hand was hidden from the officers' view because of the way his body was angled.  *See id.*, UF ¶¶ 27, 31.[3]  Mr. Schinagel began shouting out the door that they needed a warrant, but he was not really paying attention to where the officers were.  *See id.*, UF ¶ 31& Ex. B at 25-26, 28.  Officer Speer was at the end of the driveway at the rear of a large pickup truck, about 15-20 feet from Mr. Schinagel, while Officer Juarez was to the right of Officer Speer at the front fender area of the passenger side, about 15 feet from Mr. Schinagel.  *Id.*, UF ¶¶ 28-30.  The officers exchanged

---

[3]Undisputed Fact 31 uses the phrase "when [Mr. Schinagel] came out and started shouting."  Defs.' MSJ I, UF ¶ 31.  The term "came out" is unclear.  Undisputed Fact 31cites to the portion of Officer Juarez's testimony where he stated, "So when Gary came out and started shouting out the door he really wasn't paying attention to, I guess, where we were at."  *Id.*, Ex. B at 25, ll. 21-23.  Just prior to this statement, Officer Juarez had described this portion of the encounter as follows: "And then Gary opened the glass front door and stuck his head out of the door and started yelling just, 'You guys ain't coming in unless you got a search warrant.'"  *Id.*, Ex. B at 24, ll. 21-24.  Defendants, however, did not cite this portion of the testimony that explains what Officer Juarez meant by "came out."  Defendants also did not cite the following testimony that explained the "came out" phrase:

> Q: Let me stop you there.  Had Gary, at this point, ever gone through the threshold of his door to standing outside of it?
> A: No.
> Q: Okay.
> A: He was just in the threshold.
> Q: So he kind of had his door open and he was just kind of yelling at you guys?
> A: Right.

*Id.*, Ex. B at 26, ll. 4-12.  The Court therefore finds for purposes of this motion that the phrase Mr. Schinagel "came out" meant he came to the threshold of the door and stuck his head out the door with his left hand on the doorknob and his right hand not visible, not that Mr. Schinagel's entire body crossed the threshold of the door.

commands with Mr. Schinagel for about ten to fifteen seconds.  *Id.*, UF ¶ 26.

Officer Juarez and Officer Speer then moved along the passenger side of the truck, got up against the garage door, and decided to run towards Mr. Schinagel in an effort to take him into custody.  *Id.*, UF ¶ 32.  In response to the officers' commands, Mr. Schinagel said, "forget that," so he closed and locked the door.  *Id.*, UF ¶ 33.  The officers checked the door, found it locked, and then gained entry by Officer Speer shoulder-blocking the door.  *Id.*, UF ¶¶ 34-35.  The door gave way and Officer Speer and Officer Juarez entered the home.  *Id.*, UF ¶ 36.  After an altercation between Officer Speer, Officer Juarez, and Gary Schinagel, Mr. Schinagel was taken into custody. *See id.*, UF ¶ 38; Pls.' Resp., Ex. 6 at 30-31 & Ex. 7 at 31.

Officer Del Greco arrived at the scene after the Schinagels were already in custody.  Defs.' MSJ I, UF ¶¶ 39-40.  He was assigned to conduct the investigation, complete the police report, draft the criminal complaint, and put together the case.  *Id.*, UF ¶ 41.  On the night of the incident, he listened to the initial portions of the belt tape, but did not listen to the actual encounter with Mr. Schinagel.  Defs.' MSJ I, Ex. E at 38-39.  He attempted to get a statement from Mr. Schinagel, but Mr. Schinagel did not want to talk to him.  *See id.*, Ex. E at 24-25.

Officer Del Greco interviewed Officer Moore, Officer Speer, and Officer Juarez.  *Id.*, Ex. E at 40.  Officer Juarez told Officer Del Greco that Mr. Schinagel walked outside of the front door, told them to get off his property, then ran inside the house, and slammed the front door just as Officer Juarez and Officer Speer were giving chase and closing behind him.  *Id.*, Ex. E at 43. Officer Juarez explained to Officer Del Greco that his and Officer Speer's forward momentum carried them through the front door where they encountered Mr. Schinagel in the foyer of the house. *Id.*, Ex. E at 43.  Officer Juarez did not tell Officer Del Greco that he had an opportunity to stop at the door to see whether it was locked before going through it.  *Id.*, Ex. E at 44.  Neither Officer

Speer nor Officer Juarez told him that they stopped at the door before going through it.  *Id.*  Officer Juarez recounted that he was giving Mr. Schinagel commands to turn around and show his hands, but that he would not comply.  *Id.*  One of the officers told him that Mr. Schinagel appeared to hide something in his hand.  *Id.*, Ex. E at 56.[4]  Officer Juarez said they attempted to use the taser because of Mr. Schinagel's noncompliance, but the taser failed to deploy and they were forced to close the distance and use an open hand technique to take him to the ground.  *Id.*, Ex E at 45-46.  Based on his interviews with Officers Speer and Juarez, Officer Del Greco believed that they broke through the door in hot pursuit of Mr. Schinagel.  *Id.*, Ex. E at 45.  He also believed that Officer Speer conveyed basically the same version of events to him as Officer Juarez.  *See id.*, Ex. E at 50.[5]

In Officer Del Greco's interview with Officer Moore, Officer Moore told him that there were people inside the house and that he had knocked all over the house and rung doorbells trying to get their attention before he cracked open the door to try to contact them and have them turn down the noise.  *See* Pls.' Resp., Ex. 5 at 36; Defs.' MSJ I, Ex. E at 23, 37.  From what Officer Moore advised,

---

[4]At one point in his deposition, Officer Del Greco testified that neither Officer Speer nor Officer Juarez told him that they ever saw anything in Mr. Schinagel's hands.  Defs.' MSJ I, Ex. E at 44.  Later in the deposition, after looking at his report which stated that Mr. Schinagel appeared to hide something in his hand, Officer Del Greco clarified that one of the officers must have told him that fact.  *Id.*, Ex. E at 56.

[5]Notably, Officer Speer's and Officer Juarez's deposition testimony of what occurred that night is different from Officer Del Greco's version of what they told him about what occurred during his interview with them on the night in question.  Officer Juarez testified in his deposition that he and Officer Speer commanded Mr. Schinagel to get on the ground and show his hands, and that Mr. Schinagel showed his hands, revealing that he did not have anything in them.  *See* Pls.' Resp., Ex. 6 at 29.  Officer Juarez also testified that Mr. Schinagel was facing them, but side stepping away from them at the point when Officer Speer attempted to deploy a taser.  *Id.*, Ex. 6 at 30-31.  In contrast, Officer Speer testified that Mr. Schinagel had an object in his right hand during their confrontation with him.  *See id.*, Ex. 7 at 24, 31.  Officer Speer testified that Mr. Schinagel started to move towards them, and when he refused to get on the ground, Officer Speer attempted to deploy a taser.  *Id.*, Ex. 7 at 31.

Officer Del Greco thought that what transpired between Officer Moore and the Schinagels occurred at the threshold of the home and that Officer Moore did not enter the home.  *See* Defs.' MSJ I, Ex. E at 23-24.  Officer Moore stated in the interview that Mr. Schinagel told him to get out and get a warrant, and that when he told Mr. Schinagel he did not need a warrant because there was a law violation due to the loud music, Mr. Schinagel threatened to punch him in the face if he did not leave.  *See id.*  Officer Moore said that when he did not comply, Mr. Schinagel struck him, causing him to fall backwards and knocking off his glasses.  *Id.*, Ex. E at 24, 26-27.  Officer Moore relayed that they began fighting inside the house and that at some point Ms. Schinagel ran and jumped on his back.  *Id.*, Ex. E at 26-27.[6]

Officer Del Greco believed the officers' stories were consistent and fit the physical evidence of the taser deployment and Officer Moore's bent glasses.  *See id.*, Ex. E at 40.  He thus made the determination that charges would be brought against the Schinagels and what those charges would be.  *Id.*, UF ¶ 43.  Officer Del Greco charged the Schinagels with battery on a police officer and conspiracy to commit a fourth degree felony (battery).  *See id.*, UF ¶ 42 & Ex. E at 57-58.  He also arrested Ms. Schinagel because there was a misdemeanor warrant for her arrest.  *See id.*, Ex. E at 57.  At the time he charged the Schinagels, he did not know that they were alleging that Officer Moore illegally entered their house.  *Id.*, Ex. E at 59.  Officer Moore did not participate in the decision-making process concerning with what to charge the Schinagels.  *Id.*, Ex. A at 31-32.

KOB-4 news aired two stories about the incident with the first occurring on September 7, 2005.  *Id.*, UF ¶ 70.  The Albuquerque Journal also ran a story on the incident, including copies of the Schinagels' mug shots taken when they were arrested.  *Id.*, UF ¶ 69; Am. Compl. (Doc. 114)

---

[6]Officer Del Greco, in preparing his report, indicated that Officer Moore did not have any injuries.  Pls.' Resp., Ex. 5 at 17.  Officer Del Greco testified that this was a clerical error.  *Id.*

¶ 51.   Neither the paper nor the news station attempted to contact the Schinagels before they ran the stories.  Defs.' MSJ I, UF ¶ 71.  On June 20, 2006, after Plaintiffs filed their tort claim, KOB-4 news ran another story in front of the Schinagels' home, reporting their address and indicating that they were unable to comment because they were out of town.  *Id.*, UF ¶ 72.  KOB-4 attempted to contact the Schinagels before running the June 20, 2006 story, but Mr. Schinagel advised the reporter that he was not allowed to talk to her about anything.  *Id.*, UF ¶ 73.  The Schinagels' home was burglarized early the next morning.  *Id.*, UF ¶ 74.

The Schinagels have no evidence that any of the Defendants released information to the press following their arrest, that APD or any of its officers asked the Journal to run the story, or that APD or its officers convinced KOB-4 to publish the Schinagels' address.  *Id.*, UF ¶¶ 75, 77-78.  Nor do they have evidence to suggest that the City of Albuquerque or any of its agents or employees provided the media with the tort claim that appears to have been the impetus for the June 20, 2006 story.  *Id.*, UF ¶ 76.  The Schinagels do not have evidence that the burglars learned their address or that they were out of town from the news story.  *Id.*, UF ¶ 80.  Ms. Schinagel believes that APD and the media were in cahoots because the media never talked to the Schinagels to get their facts correct, despite the fact that she has no evidence to support this belief.  *Id.*, UF ¶ 81.

## II.   STANDARD

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful.  *Saucier v.*

8

*Katz*, 533 U.S. 194, 206 (2001).  When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test.  *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  The plaintiff must demonstrate that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the conduct.  *Id.*  As to the first inquiry, the question is whether the facts alleged, which are taken in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).  The second inquiry is more specific than whether the officer's conduct violated a constitutional right; the question is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances he confronted.  *Saucier*, 533 U.S. at 202.  "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  Moreover, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

If the plaintiff establishes both elements of the qualified immunity test, then the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.  *Nelson*, 207 F.3d at 1206.  Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and

reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).

## III.    ANALYSIS

### A.    Section 1983 Unlawful Detention and Arrest (Count I)

The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const., amend. IV.    Physical entry of the home is the chief evil against which the Fourth Amendment is directed.  *Wilson*, 526 U.S. at 610 (quoting *United States v. United States Dist. Court for Eastern Dist. of Mich.*,  407 U.S. 297, 313 (1972)).  Warrantless searches and seizures inside a home are presumptively unreasonable.  *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992).  Absent exigent circumstances, the threshold of the home may not reasonably be crossed without a warrant.  *Payton v. New York*, 445 U.S. 573, 590 (1980).

A person has been seized under the Fourth Amendment if a reasonable person would have believed that he was not free to leave or free to decline the officers' requests or otherwise terminate the encounter.  *See Florida v. Bostick*, 501 U.S. 429, 436 (1991); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  Circumstances that indicate a seizure include the threatening presence of several officers, the display of a weapon, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.  *Mendenhall*, 446 U.S. at 554.  Opening the door to one's home is not voluntary if ordered to do so under color of authority.  *See United Sates v. Maez*, 872 F.2d 1444, 1449-51 (10th Cir. 1989).

The warrantless arrest of a person in a public place based on probable cause, however, does not violate the Fourth Amendment.  *United States v. Santana*, 427 U.S. 38, 42 (1976) (citing *United*

10

*States v. Watson*, 423 U.S. 411 (1976)).  A person standing directly in the doorway of a house, at the threshold, stands in a public place and renounces the expectation of privacy.  *Id.*  A suspect may not defeat an arrest that has been set in motion in a public place by then escaping into a private place.  *Id.* at 42-43.

Probable cause to support a warrantless arrest exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent man to believe that the suspect has committed or was committing an offense.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).  "[I]n determining whether probable cause exists, the courts must apply the 'totality of circumstances' test."  *Brierley v. Schoenfeld,* 781 F.2d 838, 841 n.1 (10th Cir. 1986) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).  In the qualified immunity context, a defendant is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).  Law enforcement officers who reasonably but mistakenly conclude that probable cause is present are also entitled to qualified immunity.  *Id.* at 227.

### 1.    Officer Speer

As an initial matter, Defendants contend that Officer Speer is entitled to qualified immunity on Penny Schinagel's unlawful detention and arrest claims because he had nothing to do with placing her under arrest.  The Court agrees.  The undisputed facts demonstrate that only Officer Moore arrested Ms. Schinagel and that Officer Speer did not arrest Ms. Schinagel or direct or cause any of the actions resulting in her arrest.  Consequently, Ms. Schinagel's unlawful detention and arrest claim must be dismissed against Officer Speer.

Defendants argue that Officer Speer is also entitled to qualified immunity on Gary Schinagel's unlawful entry and arrest claims, because he was authorized to follow Mr. Schinagel into the residence to arrest him for  battery on a peace officer under the "hot pursuit" doctrine.

11

Plaintiffs contend that the hot pursuit doctrine does not apply because Mr. Schinagel was not standing on the porch in plain view, Officer Juarez and Officer Speer had time to stop and check to see if the door was locked before forcing it open, and there were no other exigent circumstances to justify the entry.  Plaintiffs also argue probable cause did not exist because Mr. Schinagel did not hit Officer Moore.

Officer Speer could only arrest Mr. Schinagel if he had "'reasonably trustworthy' information" that  probable cause existed that Mr. Schinagel had committed a crime.  *See Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998).  At the time he arrested Mr. Schinagel, Officer Speer had been told by Officer Moore that Mr. Schinagel struck Officer Moore at the threshold of the home.  Officer Speer had observed a mark on Officer Moore's face consistent with being hit.  Although Mr. Schinagel avers that he did not hit Officer Moore and that Officer Moore lied to the officers about being hit, facts we must view as true for purposes of this motion, Officer Speer was unaware of the misinformation and did not have cause to doubt the reliability of his fellow officer's statements and conclusions.  Officer Speer thus acted reasonably in relying on Officer Moore's statements and in believing there was probable cause to arrest Mr. Schinagel for the crime of battery on a peace officer in violation of N.M. Stat. Ann. § 30-22-24.[7]  *See Baptiste*, 147 F.3d at 1260 ("[A] police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow police officer' may nonetheless be entitled to qualified immunity as long as the officer's reliance was 'objectively reasonable.'") (quoting *Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir.

---

[7]Section 30-22-24 makes it a fourth degree felony to commit battery upon a peace officer. N.M. Stat. Ann. § 30-22-24(B).  A person commits battery on a peace officer by the "unlawful, intentional touching or application of force to the person of a peace officer while he is in the lawful discharge of his duties, when done in a rude, insolent or angry manner."  *Id.* § 30-22-24(A).

1997)); *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997) (explaining that officer may rely on information by other officers to establish probable cause absent evidence showing information was untrustworthy).

In order for the hot pursuit doctrine to apply, the suspect must have been in a public place "when the police first sought to arrest" the suspect. *See Santana*, 427 U.S. at 42.  The undisputed facts demonstrate that Mr. Schinagel came to the door voluntarily to see where his wife was.[8]  Mr. Schinagel testified that he heard the officers commanding him to "get out here" and "come out here" after he had already come to the door.  The officers exchanged commands with Mr. Schinagel at the door for about ten to fifteen seconds before Mr. Schinagel retreated into the house.  Because Mr. Schinagel went to the threshold of the home and exposed himself to the public voluntarily before he heard the commands to come out of the house, this is not a case where the suspect came out of the house in response to police commands.  *Cf. United States v. Maez*, 872 F.2d 1444, 1450 (10th Cir. 1989) (holding that suspect was arrested in home when he came out of home in response to SWAT team surrounding trailer, pointing rifles at trailer, and ordering occupants out over loudspeakers).  Although Officer Moore had earlier taken Penny Schinagel out of the home involuntarily and had attempted to arrest Gary Schinagel without success, those actions were

---

[8]In response to the question what he did to find out what was happening to his wife before the two officers arrested him, Gary Schinagel testified in his deposition as follows:

> I basically meandered from one sink to the other trying to gain my senses . . . .
> [O]nce I was able to gather my senses I said, "Where is my wife?" I was
> concerned.  So I went to the door, this door that we're talking about, the south
> door, and looked in the door like – looked at the door like that.  And there were
> officers there or, you know, might have been officers or whatever.  But there were
> people coming into the deal and they are saying, "Get out here, come out here."
> And I said forget that, so I just closed the door and locked the door.

Defs.' MSJ I, Ex. D at 140-141.

attenuated from Mr. Schinagel's decision to reopen the door and place himself in public view.  He did not testify that he felt in any way compelled to open the door and to stand in the threshold by the show of force or commands by the officers.

It is also undisputed that when Mr. Schinagel voluntarily came to the door, he was at the threshold of the door with his left hand on the door knob and his right hand hidden from view, and he poked his head out to shout at the officers.  Because Mr. Schinagel was at the threshold of an open door and had exposed most of his body to the public, he was not in an area where he had any expectation of privacy.  *See Santana*, 427 U.S. at 42 (concluding that suspect standing directly in open doorway was in public place); *McKinnon v. Carr*, 103 F.3d 934, 935-36 (10th Cir. 1996) (holding that arrest in doorway after police knocked on door and suspect opened door was not invalid because suspect voluntarily opened door and was visible, standing in threshold of doorway, open to public view).  When the officers yelled at Mr. Schinagel to leave the house and then ran towards him to take him into custody, Mr. Schinagel could not defeat the arrest that had been set in motion in the public place by retreating into his home.  *See Santana*, 427 U.S. at 43.

Plaintiffs argue that *Santana* is nonetheless distinguishable because the warrantless entry was justified there by the exigent circumstances arising from the possible destruction of evidence.  While it is true that destruction of evidence was one of the reasons the warrantless arrest was justified in *Santana*, it was not the only reason.  *See United States v. Aquino*, 836 F.2d 1268, 1271 (10th Cir. 1988) (quoting *Santana*, 427 U.S. at 44 (Stevens, J., concurring)).  Intrusion in hot pursuit cases "is also justified by the suspect's flight, which frustrates police efforts to make a legitimate warrantless arrest."  *Id.* (citing *Santana*, 427 U.S. at 43).  The Supreme Court in *Santana* expressly relied on *United States v. Watson*, 423 U.S. 411 (1976), which held that the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment, indicating that its

holding did not rest on the destruction-of-evidence exigency. *See Santana*, 427 U.S. at 43 ("We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under *Watson*, by the expedient of escaping to a private place."). The Supreme Court has since listed the hot pursuit exigency separately from the imminent destruction of evidence exigency. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Consequently, the hot pursuit doctrine applies here, even though Officer Speer did not have reason to believe that Mr. Schinagel might destroy evidence. *See United States v. Schmidt*, 403 F.3d 1009, 1015 (8th Cir. 2005) (rejecting defendant's attempts to limit *Santana* to situations where evidence was likely to be destroyed and concluding that hot pursuit can, without more, justify warrantless entry); *McKinnon*, 103 F.3d at 935-36 (applying *Santana* to justify warrantless arrest of suspect when he voluntarily opened door, even though exigent circumstances were not present).

Nor does the fact that the officers checked to see if the door was locked before forcing it open vitiate hot pursuit. The facts of this case are similar to those in *United States v. Schmidt*, 403 F.3d 1009 (8th Cir. 2005). There, an officer followed two speeding cars to the driveway of a house. *Id.* at 1011. The officer approached one of the teens who appeared to have consumed alcohol, and when the officer attempted to arrest the teen for underage drinking, the teen kicked him, ran into the house, and closed the door. *Id.* at 1012. The officer then arrested the other teenagers for curfew violations, which took between five and ten minutes. *Id.* As the officer was effecting the arrests, the teen emerged from the house and began yelling at the officer from the doorway, prompting the officer to approach the teen, who again retreated into the house and locked the door. *Id.* The officer knocked on the door, and when he received no response, kicked in the door and entered. *Id.* An altercation ensued. *See id.* Upon the teen's subsequent prosecution, he moved to suppress evidence of the events occurring inside the home, arguing that the officer abandoned his hot pursuit when he

turned to arrest the other teenagers.  *Id.* at 1012-13.  The Eighth Circuit disagreed, concluding that the officer's actions were justified under *Santana*'s hot pursuit doctrine.  *See id.* at 1014-15.  The Eighth Circuit reasoned that, when the teen reemerged and began yelling at the officer from his doorstep, he was in a public place, and because the officer had probable cause to believe he had committed a crime only minutes earlier, the officer was justified in pursuing the teen into the house to effectuate the arrest.  *Id.*  Likewise, when Mr. Schinagel reemerged from his house and stood at the doorstep, Officer Speer and Officer Juarez were justified in pursuing him into the house and forcing open the locked door to effectuate the arrest.

Morever, even if the hot pursuit doctrine did not apply, at the time of the events, it was not clearly established that Officer Speer could not enter forcibly enter the house in pursuit of Mr. Schinagel after he had voluntarily shown himself at the threshold of his home and where Officer Speer reasonably believed he had probable cause to arrest Mr. Schinagel.  Officer Speer is therefore entitled to qualified immunity on Mr. Schinagel's unlawful entry and arrest claims.

### 2.     Officer Moore

Defendants contend that Gary Schinagel's unlawful arrest claim must be dismissed against Officer Moore because he did not participate in his arrest.  "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."  *Foote*, 118 F.3d at 1423.  An official who causes a citizen to be deprived of her constitutional rights can be held liable if the official set in motion a series of events that he or she knew or reasonably should have known would cause others to violate a citizen's constitutional rights.  *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (quoting *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)).  Here, Mr. Schinagel has averred that he never hit Officer Moore and that Officer Moore lied about this fact to his fellow officers.  If Plaintiffs' version is true, then Officer Moore caused Mr. Schinagel to be arrested

16

without probable cause.  The Court will therefore deny Defendants' request to dismiss Mr. Schinagel's unlawful arrest claim against Officer Moore.  *See Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1989) (holding official personally liable for termination where official caused plaintiff's termination).

As to Penny Schinagel's unlawful arrest claim against Officer Moore, Defendants argue Officer Moore is entitled to absolute immunity because there was an outstanding misdemeanor warrant for her arrest.  In support, Defendants cite Officer Del Greco's deposition testimony in which he stated that Ms. Schinagel had a misdemeanor warrant at the time for an administrative arrest.  *See* Defs.' MSJ I, Ex. E at 57.  Although Plaintiffs contend that "it is undisputed that the warrant had been quashed prior to the night in question," Pls.' Resp. at 19, they did not cite to any admissible evidence to refute that there was an outstanding misdemeanor warrant for Ms. Schinagel's arrest on the night in question.  This Court cannot rely on unsupported arguments of counsel at the summary judgment stage.  *See* Fed. R. Civ. P. 56(e)(2).  Nevertheless, the Court finds that Defendants have not shown that they are entitled to quasi-judicial immunity.

Absolute judicial immunity has been extended to non-judicial officers where their duties had an integral relationship with the judicial process.  *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000).  For this reason, officials charged with the duty of executing a facially valid court order are absolutely immune from civil liability arising out of a suit challenging conduct prescribed by that order.  *Turney v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990).  Quasi-judicial immunity, however, does not attach if the officer acts outside the scope of his jurisdiction.  *See id.* at 1474.  The scope of absolute immunity also extends no further than necessary to protect public policy interests.  *Spielman v. Hildebrand*, 873 F.2d 1377, 1382 (10th Cir. 1989).

Even assuming that a facially valid misdemeanor arrest warrant existed at the time for Ms.

Schinagel, Officer Moore did not know of the warrant's existence until after he had already arrested her and thus he was not executing a valid court order at the time he performed the arrest. Applying absolute immunity in a case such as this would be improper because it would not serve the public interest it was designed to protect – to ensure judicial orders are enforced by not placing officers in the untenable position of choosing to disregard a judge's order and face discharge or contempt or to fulfill their duty and risk being haled into court. *See Valdez v. City and County of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989). The cases cited by Defendants are distinguishable because in those cases the officials knew that they were executing a court order. If Officer Moore illegally arrested Ms. Schinagel, his actions up to the point he learned of the valid court order should not be absolutely immune from suit by the happenstance that a warrant existed for her arrest. Consequently, the Court rejects Defendants' argument that Ms. Schinagel's unlawful and false arrest claims must be dismissed based on the outstanding arrest warrant. *See Starr v. Downs*, 117 Fed. Appx. 64, 68 (10th Cir. Nov. 17, 2004) (unpublished opinion) (explaining that, although plaintiff was ultimately arrested based on valid warrant for unrelated offense, court had to still determine validity of involuntary detention that occurred prior to officer learning of warrant).

### 3.     Officer Del Greco

Defendants also contend that the unlawful arrest claims must be dismissed against Officer Del Greco, because he did not participate in either Gary or Penny Schinagel's arrests. It is undisputed that when Officer Del Greco arrived at the Schinagels' home, both Gary and Penny Schinagel were already arrested and in custody. Officer Del Greco did, however, conduct an investigation into the altercation and decide what charges would be brought against the Schinagels.

An unlawful arrest or detention ends once the victim becomes held pursuant to legal process, when, for example, he is bound over by a magistrate or arraigned on charges. *Wallace v. Kato*, 549

U.S. 384, 127 S.Ct. 1091, 1096 (2007).  "Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process."  *Id.*  Damages for a false arrest claim cover the time of detention up until issuance of process or arraignment, but not more. *Id.*  From that point on, any damages recoverable must be based on a malicious prosecution claim, rather than the detention itself.  *Id.*  Because Officer Del Greco decided to bring charges against the Schinagels, their continued detention from the time Officer Del Greco decided to charge them up to the time they were arraigned, falls within the § 1983 unlawful arrest claim.  The Court will thus consider Officer Del Greco's actions in ruling on both Plaintiffs' unlawful arrest and malicious prosecution claims.

Plaintiffs' unlawful arrest claims against Officer Del Greco hinge on whether his investigation gave probable cause to continue to detain and charge them.  It is undisputed that Officer Moore relayed to Officer Del Greco the following facts:[9]  Officer Moore knew there were people in the house; he opened the door to try to contact them and have them turn down the noise; he remained at the threshold of the door; Mr. Schinagel told him to get out and get a warrant; when Officer Moore told Mr. Schinagel he did not need a warrant because there was loud music, Mr.

---

[9]Although Plaintiffs dispute what actually occurred between Officer Moore and Gary Schinagel, they have no evidence to dispute Officer Del Greco's testimony of what he learned from Officer Moore during his investigation.  Plaintiffs attempt to impeach Officer Del Greco's testimony by suggesting some malicious intent from his belt tape being lost or destroyed.  Their sole evidence for this argument is that Officer Del Greco filled out an evidence tag for a belt tape for this incident.  Plaintiffs have not shown that the evidence tag for the belt tape referenced Officer Del Greco's belt tape, and not Officer Moore's belt tape.  Even assuming that Officer Del Greco tagged his own belt tape into evidence, and it was lost or destroyed, Plaintiffs have no evidence that it was purposely lost to conceal what the officers told Officer Del Greco that night. The evidence tag alone is simply insufficient to create a genuine issue of material fact of what Officer Del Greco learned during his investigation.

Schinagel threatened to punch him in the face if he did not leave; when Officer Moore did not comply, Mr. Schinagel struck him, causing him to fall backwards and knocking off his glasses; they began fighting inside the house and that at some point Ms. Schinagel ran and jumped on his back. Because Mr. Schinagel declined to speak with Officer Del Greco and Officer Moore's bent glasses were consistent with him having been struck, Officer Del Greco had no reason to doubt Officer Moore's version of events.  Based on these facts, Officer Del Greco had probable cause to arrest and charge the Schinagels with battery on a peace officer.  At the time he detained and charged Penny Schinagel, Officer Del Greco had also learned of Ms. Schinagel's misdemeanor warrant and thus he had probable cause to continue to detain her on the warrant.

Plaintiffs nonetheless argue that Officer Del Greco's investigation was poorly performed, as evident by his failure to listen to the entire belt tape, his ignoring inconsistencies in Officer Juarez's and Officer Speer's versions of events, and his failure to note Officer Moore's injury in his report.  The "probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." *Romero v. Fay*, 45 F.3d 1472, 1476-77 (10th Cir. 1995).  Officer Del Greco interviewed the officers on the scene and attempted without success to interview Mr. Schinagel.  Officer Moore's bent glasses corroborated his statements that he had been struck.  Officer Del Greco had reason to credit the observations of a fellow officer, as there was no apparent motive for Officer Moore to fabricate his story.  Although the failure to listen to the entire belt tape is certainly less than stellar police work, it does not negate probable cause, because Officer Del Greco had no reason to believe that the contents of the belt tape would contradict Officer Moore's version of events and the sound recording did not, in fact, conclusively reveal whether or not Mr. Schinagel hit Officer Moore and

where exactly they were standing when the altercation ensued. *Cf. Romero*, 45 F.3d at 1477-78 (rejecting argument that officer's failure to contact plaintiff's alleged alibi witnesses in itself amounted to a constitutional violation where plaintiff had failed to show that officer's initial probable cause determination was itself unreasonable). Nor are the overall contents of the belt tape so inconsistent with what Officer Moore told him occurred that Officer Del Greco would have cause to doubt Officer Moore's version of events had he listened to the entire tape. The belt tape thus does not constitute readily available evidence from which a reasonable officer would have concluded probable cause was lacking. As to inconsistencies in Officer Juarez's and Officer Speer's versions of events, they did not arrive until after the altercation between Officer Moore and the Schinagels had ended, so their statements did not contribute to the probable cause for the underlying charges brought against the Schinagels. Finally, Officer Del Greco's failure to note Officer Moore's injury in his report is not sufficient to negate probable cause.

In sum, based on the information provided to him, Officer Moore's bent glasses, and the fact that the belt tape would not have revealed significant inconsistencies with Officer Moore's version of events, Officer Del Greco had probable cause to believe that Gary Schinagel struck Officer Moore at the threshold of the home, that Penny Schinagel jumped on Officer Moore's back during the altercation, and that she had an outstanding misdemeanor warrant, facts which supported their detention and the charges filed against them. Officer Del Greco is thus entitled to qualified immunity on Plaintiffs' § 1983 unlawful arrest claims.

### B.      False Arrest and False Imprisonment (Count III)

"The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so." *Santillo v. N.M. Dept. of Public Safety*, 2007-NMCA-159, ¶ 12, 143 N.M. 84. The torts of false

21

arrest and false imprisonment are similar in that a false arrest is merely one way of committing false imprisonment. *Id.* "An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." *Id.*

Resolution of these claims follows the reasoning of the § 1983 unlawful arrest claims. Officer Speer did not arrest, confine, or constrain Penny Schinagel, and he had probable cause to arrest, confine, and constrain Mr. Schinagel, so he is entitled to summary judgment on both their false arrest and false imprisonment claims. Similarly, Officer Del Greco had probable cause to arrest the Schinagels, so he is entitled to summary judgment on these claims. Finally, Officer Moore is not entitled to summary judgment on Ms. Schinagel's false arrest and false imprisonment claims based on the warrant, because at the time he arrested her, he did not have knowledge that a warrant existed. He therefore has not shown that he arrested her with knowledge that he had lawful authority to do so based merely on the warrant. As to Mr. Schinagel, a factual dispute exists as to whether Officer Moore lied about Mr. Schinagel hitting him, and thus, whether he caused Mr. Schinagel to be falsely arrested. Consequently, he is not entitled to summary judgment on this claim.

### C.      Malicious Prosecution (Count V)

It is unclear from the Amended Complaint whether Plaintiffs are asserting a malicious prosecution claim under § 1983 or a state law malicious abuse of process claim. In their response brief, however, Plaintiffs only address malicious prosecution under § 1983. The Court will thus presume that Plaintiffs are only asserting a § 1983 malicious prosecution claim and will limit its analysis to this claim.

The Tenth Circuit "has recognized the viability of malicious prosecution claims under § 1983." *Taylor v. Meacham,* 82 F.3d 1556, 1560 (10th Cir. 1996). The common law elements of

malicious prosecution are the starting point for the analysis of a § 1983 malicious prosecution claim, but the ultimate question is always whether the plaintiff has proven a Fourth Amendment constitutional violation.  *Id.* at 1561.  A § 1983 malicious prosecution claim includes the following elements:  (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) termination of the original action in favor of plaintiff; (3) lack of probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.  *See Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008); *Pierce v. Gilchrist*, 359 F.3d 1279, 1291-97 (10th Cir. 2004).

As discussed more fully above, Officer Del Greco had probable cause to continue Plaintiffs' confinement and to institute charges against them; therefore, he is entitled to summary judgment on their malicious prosecution claims.  As to Officer Moore, Defendants contend that Plaintiffs' malicious prosecution claims must be dismissed because Officer Moore did not file the criminal complaint or personally participate in determining whether charges should be filed against the Schinagels.  This Court has already rejected Officer Moore's virtually identical argument in ruling on Mr. Schinagel's unlawful arrest claim.  An officer who causes others to file fraudulent charges against an innocent civilian cannot insulate himself and escape liability under § 1983.  *See Pierce*, 359 F.3d at 1292-93 (holding that forensic chemist who allegedly lied and distorted evidence to convince prosecuting authorities to press charges cannot hide behind fact that she neither initiated nor filed charges against plaintiff).  Although Officer Moore did not personally file the charges against Plaintiffs, his alleged lies concerning the altercation at the house supplied the basis for Officer Del Greco's probable cause determination and caused Plaintiffs' continued confinement and prosecution, such that he can be held liable for malicious prosecution.  *See Wilkins*, 528 F.3d at 805-06 (holding that officers who intentionally coerced false statements were not entitled to qualified

23

immunity on malicious prosecution claim because a reasonable officer should have known no probable cause existed without statements); *Pierce*, 359 F.3d at 1291-93 (holding that police forensic analyst who knowingly and recklessly informed police and prosecutors that hair analysis supported plaintiff's involvement in rape, even though analysis tended to exonerate him, met initiation-of-original-action requirement of malicious prosecution claim).  Because questions of fact remain as to whether Gary and Penny Schinagel committed battery on a peace officer and whether Officer Moore lied about what occurred, Officer Moore is not entitled to summary judgment on Plaintiffs' malicious prosecution claims.[10]

### D.      Defamation (Count VI)

Under New Mexico law, a plaintiff must prove the following elements to establish a claim for defamation: (1) a publication by the defendant, (2) of an asserted fact, (3) which is defamatory, (4) communicated to a third person, (5) of and concerning the plaintiff, (6) and proximately causing injury to the plaintiff.  *Schwartz v. American College of Emergency Physicians*, 215 F.3d 1140, 1144 (10th Cir. 2000) (citing *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 773 P.2d 1231, 1236 (1989)).  Defendants contend that Plaintiffs' defamation claim must be dismissed because Plaintiffs have no evidence that any of the Defendants published false statements to the media.  Based on the record, the Court agrees.  Plaintiffs failed to address this claim in their response, and they have presented no evidence that any of the Defendants released information to the press following their arrests,

---

[10]Defendants argued for the first time in their reply that Plaintiffs have failed to demonstrate a genuine issue of material fact that the criminal prosecution terminated in their favor.  *See* Defs.' Reply (Doc. 100) at 11.  The Court declines to rule on this issue because it was not raised until the reply brief and the record is completely insufficient to allow the Court to determine one way or the other why the district attorney declined to further prosecute Plaintiffs. *See Vaughn v. Epworth Villa*, 537 F.3d 1147, 1153 n.5 (10th Cir. 2008) (noting that court does not ordinarily review issues raised for first time in reply brief).

convinced the news media to run the story, or in any other way published a defamatory statement. Consequently, Defendants are entitled to summary judgment on Plaintiffs' defamation claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Illegal Entry, False Arrest, Malicious Prosecution, and Defamation Claims, and Plaintiff Penny Schinagel's False Arrest Claim (Doc. 67) is **GRANTED** in part and **DENIED** in part as follows:

1. Officer Speer's and Officer Del Greco's requests for summary judgment on Penny Schinagel's and Gary Schinagel's § 1983 unlawful entry, detention, and arrest claims and state law false arrest and imprisonment claims are **GRANTED**;

2. Officer Moore's request for summary judgment on Penny Schinagel's and Gary Schinagel's § 1983 unlawful detention and arrest claims and state law false arrest and imprisonment claims is **DENIED**;

3. Officer Del Greco's request for summary judgment on Penny Schinagel's and Gary Schinagel's § 1983 malicious prosecution claims is **GRANTED**;

4. Officer Moore's request for summary judgment on Penny Schinagel's and Gary Schinagel's § 1983 malicious prosecution claims is **DENIED**; and

5. Defendants' request for summary judgment on Plaintiffs' defamation claims is **GRANTED**.

_____

SENIOR UNITED STATES DISTRICT JUDGE