**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GARY SCHINAGEL and
PENNY SCHINAGEL, Husband and Wife,

        Plaintiffs,

-vs-          CIVIL NO. 07-00481 LH/RLP

THE CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
RUSSELL MOORE, RAYMOND DEL GRECO,
LEE SPEER and JOHN DOES 1-15,

        Defendants.

DEPOSITION OF MICHAEL CALLAWAY

February 12, 2008
9:09 a.m.
200 Lomas NW, Suite 850
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:   LISA P. FORD, ESQ.
            ATTORNEY FOR PLAINTIFFS

REPORTED BY: Amy M. Drum, RPR, NM CCR #49
            Kendra Tellez Court Reporting, Inc.
            Suite 1500E
            300 Central, Southwest
            Albuquerque, New Mexico 87102

**Page 2**

APPEARANCES

For the Plaintiffs:
  LISA P. FORD, ESQ.
  WAGNER, FORD & ASSOCIATES, P.A.
  200 Lomas Blvd., NW, Suite 850
  Albuquerque, New Mexico 87102
  (505) 242-6300

For the Defendants:
  LUIS E. ROBLES, ESQ.
  ROBLES, RAEL & ANAYA, P.C.
  500 Marquette Ave., NW, Suite 700
  Albuquerque, New Mexico 87102
  (505) 242-2228

**Page 3**

INDEX

EXAMINATION OF MICHAEL CALLAWAY   PAGE
  By Ms. Ford   4

CERTIFICATE OF COMPLETION OF DEPOSITION   88

EXHIBITS   INITIAL REFERENCE PAGE

1  30(b)(6) Notice to Take Deposition   16
2  Albuquerque Police Department, Procedural Orders, Use of Force   27
3  Internal Affairs Unit Use-of-Force Report Form, Chris Juarez   31
4  Internal Affairs Unit Use-of-Force Report Form, Russell Moore   31
5  Internal Affair Unit Use-of-Force Report Form, Lee Speer   31
6  New Mexico Court of Appeals Opinion   55
7  Albuquerque Police Department, Procedural Orders, Search and Seizure Without a Warrant   64

**Page 4**

          MICHAEL CALLAWAY
        after having been duly sworn
        under oath testified as follows:
           EXAMINATION
BY MS. FORD:

Q. Please state your full name.
A. Michael D. Callaway.
Q. And how do you prefer to be called, Officer Callaway or Mr. Callaway?
A. If it's by title it would be Deputy Chief Callaway or Mr. Callaway or Michael is fine too.
Q. I'll probably forget which one I've chosen and use them all at different periods of time.
    What is your position with the Albuquerque police force?
A. Deputy chief of police of the field services bureau.
Q. What does that position entail, what kind of job duties?
A. I have oversight of the department's field services bureau, which is comprised of the -- currently the five area commands. In addition, I have oversight of our behavioral sciences division, operations review section, chaplain program, reserve officer program -- let's see if I'm forgetting anything -- FTO coordinator

5

1  program. That covers it.
2       My job duties are I'm responsible for day-to-day
3  operations of the department. In addition, I'm
4  responsible for developing policies and procedures for
5  the Albuquerque Police Department. I'm responsible for
6  managing the department's budget for the field services
7  bureau, determining staffing and resource allocations
8  for all law enforcement services across the city.
9       Each of the area commands operate independently
10 of each other, but also interdependently with all the
11 resources within the police department.
12   Q.  How long have you held this position?
13   A.  Since November of 2006.
14   Q.  And to whom do you report?
15   A.  The chief of police, Ray Schultz.
16   Q.  And do you have staff?
17   A.  Yes, I do.
18   Q.  How many people work for you in your immediate
19 staff?
20   A.  My immediate staff is comprised of my operations
21 review section, which is staffed by a lieutenant as
22 well as three officers. I have an administrative aide
23 that reports directly to me. In addition, five area
24 commanders are part of my immediate staff, as well as
25 my crime prevention specialist, and our department

6

1  psychologist.
2    Q.  How long have you been with APD?
3    A.  For 20 years.
4    Q.  What position did you hold prior to your present
5  position?
6    A.  I was the commander. I held the rank of
7  captain. I was commander of the special investigations
8  commission.
9    Q.  Special investigations?
10   A.  Yes.
11   Q.  And what did that division do?
12   A.  Essentially, I was responsible for oversight of
13 all the departments undercover operations. The two
14 sections involved in that were the narcotics section
15 and the criminal section.
16   Q.  How long did you hold that position?
17   A.  I held that position -- I'm trying to think on
18 the dates -- for approximately a year-and-a-half, less
19 than two years.
20   Q.  And what position did you hold before that one?
21   A.  I was the -- also held the rank of captain. I
22 was the southeast area commander, which was responsible
23 for day-to-day police operations in the southeast
24 quadrant of the city.
25   Q.  How long did you have that position?

7

1    A.  A period of a year.
2    Q.  One year?
3    A.  Yes.
4    Q.  And how about before that?
5    A.  Before that I was the -- I held the rank of
6  lieutenant. I was the narcotics section commander,
7  where I was responsible for oversight of the narcotics
8  section. There's three narcotics teams, as well as
9  detectives assigned to a couple of different task
10 forces.
11   Q.  And how long did you hold that position?
12   A.  Approximately a year-and-a-half.
13   Q.  Is that sort of an average time frame for moving
14 through positions?
15   A.  It just seems to be for me.
16   Q.  And how about right before that position?
17   A.  I was a watch commander assigned to the
18 foothills area command. And I held that position,
19 actually for a period of two-and-a-half years. I had
20 oversight of day and swing patrol operations, as well
21 as -- well, as well as graveyard operations. There was
22 a couple of different assignments. Same position, same
23 essential functions, but just different shifts.
24   Q.  Have you left the employment of APD at any time
25 in the past 20 years?

8

1    A.  No, I haven't.
2    Q.  And did you have any law enforcement experience
3  prior to joining APD?
4    A.  No.
5    Q.  Can you tell me a little bit about your
6  educational background.
7    A.  Okay. In 1998 I earned a Master of Arts in
8  organizational management from the University of
9  Phoenix. My undergraduate degree is university studies
10 with emphasis in criminal justice. I earned that in --
11 I have to think about the year now -- '94, '95. I
12 earned an associate's degree in criminal justice from
13 Albuquerque TVI in the early '90s. I'm a graduate of
14 the FBI National Academy, 231st session. I attended
15 there from December -- or I'm sorry, September to
16 December of '07.
17   Q.  Just this past September?
18   A.  Yes.
19   Q.  Do you know personally any of the named
20 defendants in this lawsuit?
21   A.  No, I do not. Or personally? Well, I'm sorry.
22 The named defendants --
23   Q.  I'll do them individually.
24   A.  Okay.
25   Q.  Do you know Russell Moore.

13

1  case?
2  A. I don't remember it, no.
3  Q. How about the depositions you gave prior to that
4  one?
5  A. Specifically, I'm not certain. I mean, I don't
6  remember. I'm -- I don't remember which deposition I
7  gave before that one, sorry.
8  Q. How about any depositions that you have a
9  recollection of giving in, say, the last three years?
10 A. I recall the case regarding an employment action
11 where -- I remember there was numerous settings and I
12 don't remember the specifics of the deposition itself,
13 but it was involving, I guess, an action taken against
14 an employee by the department, and ultimately the
15 employee sued the department. Bits and pieces of that
16 now.
17      But to speak specifically to that deposition,
18 I'm unable to do so. I remember the case. And like I
19 said, there was numerous proceedings that went with the
20 particular case, in terms of that type of thing.
21 Q. Who was the claimant's attorney in that case, do
22 you recall?
23 A. Tom Clear.
24 Q. Was there a police officer involved?
25 A. Yes.

14

1  Q. And who was the police officer?
2  A. Joleen Dye.
3  Q. And in what other cases do you recall giving a
4  deposition in the past three years?
5  A. The past three years, those are the only ones
6  that are coming to mind.
7  Q. If any others come to mind during the course of
8  this deposition, please let me know.
9  A. Certainly.
10 Q. How about going back five years?
11 A. Those would be the only ones that come to mind.
12 Q. In the past five years you can only recall two
13 cases that you testified in?
14 A. I'm certain there are others, I just -- I don't
15 remember all the facts and circumstances about the
16 depositions and those type of things.
17 Q. Have you ever given a deposition in a case
18 involving an allegation of a violation of a
19 constitutional right?
20 A. Well, the case that I mentioned may have. The
21 first one that I don't remember all the facts and
22 circumstances, like I said, it was a deposition. I
23 provided one, but it was -- my recollection is that
24 involved a constitutional right now that you say it.
25 I don't remember -- recall it involving an employment

15

1  action. I would say with a degree of certainty, most
2  of the depositions I have given have pertained to
3  employment actions.
4  Q. I want to just focus your attention on the other
5  depositions that you gave that may have involved
6  constitutional right violations. Do you have any
7  recollection of testifying in any of those cases by
8  deposition?
9  A. Like I said, I'm not -- the facts and
10 circumstances regarding those don't come to mind at
11 this time. And with respect to this matter, I did not
12 review or research or delve into any prior depositions
13 that I may have given, because I did not know I was
14 going to be asked about that.
15 Q. Do you keep copies of your prior depositions?
16 A. Routinely, no.
17 Q. So as we sit here today, are you able to tell me
18 about any case that you gave deposition testimony in
19 regarding an allegation of a violation of a
20 constitutional right?
21 A. No.
22 Q. How about any police officers, any of those
23 stand out as involving you giving deposition testimony
24 in a case involving a constitutional right?
25 A. Well, I think I've answered that. No, I don't

16

1  have any specific recollection of a particular case or
2  anything like that, no.
3  Q. I'll hand you what we'll mark as Exhibit 1 to
4  your deposition.
5     (Exhibit 1 marked for identification.)
6  A. Okay.
7  Q. (By Ms. Ford) And I will represent that that is
8  the 30(b)(6) deposition notice, which presents various
9  topics.
10 A. Yes.
11 Q. And I believe that you are provided as a
12 representative for the City of Albuquerque, for the
13 police department, to testify concerning one or more of
14 these topics; is that your understanding?
15 A. Yes.
16 Q. And that you are, in fact, an agent and
17 representative for the city and the police department
18 concerning the topics that you're here to testify to?
19 A. Yes.
20 Q. Can you identify for me those topics that you
21 are here for today.
22 A. Can you show me specifically which topics. I
23 think numbers 3, 5 --
24 Q. Okay. Hold on. Number 3, number 5.
25 A. Number 6, number 7, and number 12, and number --

17

1   a portion of number 10.
2   Q.  A portion of number 10?
3   A.  I guess that's related. That's it.
4   Q.  Category number 3 is, "The City of
5   Albuquerque/Albuquerque Police Department's policies
6   and procedures, written directives, unwritten
7   directives and position in general regarding entry by
8   APD officers into the personal residences of citizens,
9   including the opening of doors to residences."
10  A.  Okay.
11  Q.  You're here to testify regarding that today --
12  A.  Right.
13  Q.  -- on behalf of the City and APD?
14  A.  Yes.
15  Q.  What is your understanding of Officer Moore's
16  entry into the Schinagel household the evening of this
17  incident?
18  A.  Okay. My understanding is that Officer Moore
19  was investigating a loud noise complaint. He was
20  outside the residence. He knocked on the door. The
21  volume of the music was such that -- well, nobody
22  answered the door. And the music was loud. And then
23  the sound of it would decrease and become loud again.
24  Officer Moore knocked at the door several times.
25  Ultimately Officer Moore opened the door to the

18

1   residence, made notification by announcing,
2   "Albuquerque police."
3       And in this particular incident, Mr. Schinagel's
4   contention is that Officer Moore entered the
5   residence. Officer Moore's contention is that he stood
6   at the doorway of the residence, outside the residence.
7       Ultimately, an altercation took place between
8   Officer Moore and Mr. Schinagel, which ended up being
9   inside of the residence. Officer Moore removed
10  Mrs. Schinagel. She became involved in the
11  altercation. He removed Mrs. Schinagel from the
12  residence. And additional responding officers came and
13  ultimately placed Mr. Schinagel into custody.
14  Q.  Did you participate in any way in an actual
15  investigation of this incident?
16  A.  No.
17  Q.  So looking at category 10 on Exhibit 1, that
18  reads, "Any investigation of what Officer Russell Moore
19  was doing at any particular time regarding the time and
20  matters recorded on his belt tape."
21      You indicated that you were going to be
22  testifying to a portion of category 10. Can you
23  explain that to me.
24  A.  Well, I thought that related to question number
25  5 about whether -- about whether or not there was an

19

1   investigation done. If it simply means an
2   investigation -- as to whether or not I conducted an
3   investigation, then, I guess, 10 would not be
4   applicable.
5   Q.  So you're going to talk in generic terms about
6   an investigation, if any, that occurred?
7   A.  Yeah, talk about policy matters regarding an
8   investigation and how investigations progress through
9   the police department.
10  Q.  And how did you come upon the knowledge that you
11  just set forth for me about how this incident occurred?
12  A.  By reviewing the police reports of the incident,
13  a copy of the officer's belt tape, and the supplemental
14  reports written by the responding officers.
15  Q.  Did you listen to the belt tape?
16  A.  Yes, I did.
17  Q.  From beginning to end?
18  A.  Yes, I did.
19  Q.  Did you read a transcript of it?
20  A.  Yes, I did.
21  Q.  You did both?
22  A.  Yes.
23  Q.  When did you listen to the belt tape?
24  A.  I've listened to it a couple of -- well,
25  probably three times. The first time was approximately

20

1   a week ago. And I reviewed it yesterday, again, in
2   preparation for speaking here today.
3   Q.  What format did you listen to the belt tape in,
4   was it on the micro cassette?
5   A.  No, it was a copy burned to a CD.
6   Q.  And did you review the reenactment of it created
7   by the plaintiffs in this case, the visual reenactment?
8   A.  No, I did not.
9   Q.  And I thought you said you listened to the belt
10  tape three times.
11  A.  Last week when I was listening to it. And the
12  first time I listened to it, I listened to it a couple
13  of times.
14  Q.  And then you said most recently was yesterday?
15  A.  Yes.
16  Q.  Have you read any depositions taken in this
17  case?
18  A.  No, I have not.
19  Q.  Did you talk with any of the officers involved
20  in this case?
21  A.  No, I did not.
22  Q.  And I assume you spoke with Louis Robles. I
23  don't want to know the substance of any conversation
24  with him, but did you speak with him about this case?
25  A.  Yeah, I spoke with Mr. Robles.

Page 65

1  Q. And without appropriate circumstances, that
2  would be a violation of the citizen's civil rights?
3  A. Okay. You kind of gave me half the question.
4  Q. Would it be fair to say that before a police
5  officer may enter into a citizen's residence, that
6  there must be conduct warranting that entry?
7  A. Certainly.
8  Q. And if that conduct is not present, then the
9  police officer has violated that citizen's Fourth
10 Amendment constitutional rights --
11 A. Sure.
12 Q. -- and state civil rights?
13 A. Yes.
14 Q. Is opening the door of a residence permissible
15 constitutional conduct for a police officer?
16 A. Merely opening the door of the residence?
17 Q. Yes.
18 A. It just would depend on the circumstances.
19 Q. What would the circumstances be?
20 A. There's a whole host of circumstances,
21 potentially from, depending on the type of circumstance
22 or the type of situation, it's -- things that come to
23 mind is, again, you have a welfare check, to hot
24 pursuit of an individual, to -- I mean, it's -- could
25 you kind of narrow the question for me?

Page 66

1  Q. Sure.
2     The police officer is at the scene investigating
3  a loud noise violation. And the police officer comes
4  to the front door and knocks and there's no response.
5  What, if any, circumstance would make the police
6  officer's conduct of opening that front door
7  constitutionally permissible?
8  A. Well, I think in terms of it, this is where
9  potentially the law maybe is little unclear. Simply
10 opening the door, announcing your presence, trying to
11 garner the attention of the persons inside, is
12 potentially permissible. Like I say, it's...
13 Q. I just want to make sure that that is the police
14 department's present position regarding this question.
15 A. Well, I think the way to answer that question is
16 the officers at the scene have to initiate an
17 investigation and take into consideration their
18 observations and decide upon the most prudent course of
19 action based on all of their observations at the
20 scene.
21 Q. Going back to my previous question.
22    Given the circumstance of an investigation of a
23 loud noise violation and the officer is standing in a
24 door and he's knocked and nobody has answered within a
25 few minutes, is it constitutionally permissible for

Page 67

1  that police officer to open the door to that house?
2  A. And my answer is that is where the -- that
3  situation -- how is the best way to put it? Simply
4  opening the door and announcing, without going into the
5  house, is potentially constitutionally permissible from
6  the standpoint of we can get different opinions,
7  different legal opinions on that same set of
8  circumstances.
9  Q. Is it your testimony that that conduct of
10 opening the door is permissible if things like a
11 welfare check is invoked or hot pursuit or an exigent
12 circumstance?
13 A. Yes.
14 Q. Absent any of those three, would it be
15 constitutionally permissible to open the door of that
16 house, given that you're just standing there
17 investigating a loud noise complaint?
18 A. Simply opening the door -- and again -- and
19 announcing the presence, is potentially permissible.
20 Q. Potentially?
21 A. Yes.
22 Q. That sounds like a qualifier. Explain when it
23 would be.
24 A. What I'm saying is you have to take into
25 consideration all the circumstances presented to the

Page 68

1  officer. And we expect them to make a decision on the
2  scene with the information that is provided to them.
3  Q. What circumstances, if you don't have a welfare
4  check, a hot pursuit, or exigent circumstances, what
5  other circumstances would warrant a police officer
6  opening the door to a citizen's residence when they're
7  just investigating --
8  A. Consent, of course, would be another.
9  Q. Absent consent, what other circumstances would
10 permit an officer to open the door to a citizen's
11 residence while investigating a loud noise complaint?
12 A. The only other circumstances that comes to mind
13 is -- well, let me see how I would like to say this.
14 I'll say with respect to -- I think we laid everything
15 out. I think you mentioned the exigent circumstances,
16 welfare check, hot pursuit, consent.
17 Q. So if none of that is present, the officer does
18 not have a constitutional right to open the door to a
19 citizen's house, does he or she?
20 A. Let me mention this. This is where the law has
21 been unclear on simply opening the door of a residence
22 in terms of --
23 Q. Describe for me how the law is unclear.
24 A. Well, in terms of -- I'm not familiar --
25 obviously, I'm not intimately familiar with this matter

Page 69

1  as yourself and Mr. Robles would be, but I can say with
2  some degree of informed opinion is that
3  constitutionally simply opening the door has not been,
4  in terms of loud music, loud party calls, has not been
5  viewed as necessarily constitutionally prohibited in
6  and of itself. It does not necessarily constitute an
7  entry into the residence, in and of itself.
8  Q. And where did you obtain that knowledge?
9  A. Specifically, I've had discussions with
10 attorneys, I have read some legal opinions in years
11 past. I can't cite anything specifically, but...
12 Q. As a representative spokesperson for APD, are
13 you testifying here today that it is APD's position
14 that until the law becomes clearer, it is
15 constitutionally permissible for police officers to
16 open the door of a citizen's residence when they're
17 investigating noise violations?
18 A. No, I'm not making that specific statement, I
19 think. But I have answered the question to the best of
20 my abilities. So you're making -- like I said, I'm
21 trying to answer your question, but I think you're
22 drawing the conclusion.
23 Q. Well, I don't want to draw an erroneous
24 conclusion. I really want to understand.
25 A. Can I ask you a question? Can we take a

Page 70

1  restroom break?
2       MS. FORD: Sure.
3       (Recess taken from 10:47 a.m. to 10:51 a.m.)
4  Q. (By Ms. Ford) Category number 7 in Exhibit 1
5  deals with policies and procedures for investigating a
6  noise violation.
7  A. Okay.
8  Q. Are you familiar with those?
9  A. Yes.
10 Q. Can you just -- is there anything written down,
11 first of all?
12 A. Regarding noise violation, specifically, no.
13 Q. Can you then set forth for me what the City's
14 policies and procedures are for a police officer
15 investigating a noise violation?
16 A. Certainly. Of course, a call is received, and
17 I'll make an assumption we're talking noise violation
18 at a residence versus an automobile, for example.
19 Typically a call is received to dispatch, who takes and
20 collects the information presented by the caller,
21 provides that information to the dispatcher, who
22 ultimately dispatches an officer on the call.
23      The officer's responsibility, if possible, would
24 be to contact the calling party, ascertain the nature
25 of the complaint and then proceed to the location of

Page 71

1  the complaint, take into consideration his or her
2  personal observations of the noise complaint, and other
3  factors such as the time of day, exactly the extent of
4  the disturbance, in terms of how loud it is, is the
5  level of the noise unreasonable or not.
6       And then the first course of action would be to
7  attempt to contact the responsible party and make --
8  ask them to, of course, turn the noise down.
9  Q. And how would that be performed?
10 A. How would that be performed?
11 Q. Yes.
12 A. By proceeding to the location of the complaint
13 and making contact with the person.
14 Q. How would that be performed?
15 A. In this case, I'll jump ahead a little bit.
16 With respect to a residence, knocking on the door of
17 the residence and trying to make contact with the
18 person.
19 Q. Is there any policy or procedure dealing with
20 calling the resident if the phone number is listed?
21 A. A specific policy or procedure, no.
22 Q. Is that routinely done?
23 A. Yes.
24 Q. So Officer Moore had several options when he
25 approached the Schinagel household to investigate the

Page 72

1  loud noise violation. One was to -- let me just get
2  this straight -- knock on the door to try to make
3  contact with the resident; is that correct?
4  A. Yes.
5  Q. Would Officer Moore have available to him an
6  investigation of the curtilage around the house?
7  A. What do you mean by the question?
8  Q. Should he have opened closed gates and gone down
9  side alleys around this house as part of his noise
10 violation investigation?
11 A. Gone down side alleys. The side of the house,
12 specifically you're meaning?
13 Q. Yes.
14 A. That just depends on the circumstances that
15 presented itself at the time to him.
16 Q. Are you familiar with the term "curtilage"?
17 A. Yes.
18 Q. And what is it?
19 A. That is the property surrounding the exterior of
20 the house.
21 Q. Is there a significance to the term, in terms of
22 Fourth Amendment protections?
23 A. Yes, there is.
24 Q. What is it?
25 A. That curtilage is protected.

Page 73

1  Q. Is it fair to say that absent certain
2  circumstances, the curtilage of a house should not be
3  broken by a police officer?
4  A. Let me say this, because I think we're kind of
5  getting into a legal analysis again. Regarding that, I
6  would respectfully say that, again, maybe the city
7  attorney or the prosecuting attorney would be the
8  person to ask those questions to.
9  Q. What would the curtilage of a house normally be
10 of a residence?
11 A. The property immediately surrounding the house
12 itself.
13 Q. And would the curtilage of the Schinagel's house
14 include their alley which was closed in by a closed
15 gate?
16 A. Yes.
17 Q. Officer Moore also had available to him the
18 option of trying to telephone and reach the Schinagels
19 by phone; is that correct?
20 A. Yes, through radio communications. I do not
21 know if he had his own phone or not.
22 Q. So he would have called dispatch, they would
23 have tried to find the phone number, and then they
24 would have probably called. Is that the way it often
25 works out?

Page 74

1  A. Typically, yes. With the advent of cell phones
2  being as prolific as they are, of course, sometimes
3  officers simply obtain a number and they try on their
4  own phone as well.
5  Q. And do you have any knowledge as to whether
6  Officer Moore tried that?
7  A. No, I do not.
8  Q. Do you have any understanding as to what Officer
9  Moore was doing for the nine plus minutes before he
10 made contact with the Schinagels?
11 A. Other than noting the violation, I do not know.
12 Well, I can only speculate, in terms of looking for
13 access to the residence or the doors to the residence,
14 walking around, walking on the side of the house,
15 walking, looking for -- the doors are kind of confusing
16 with the house. If you've seen it, essentially,
17 there's two front doors to the house.
18 Q. So you have seen photographs of the house?
19 A. Yes.
20 Q. When did you see the photographs of the house?
21 A. Within the last week or so. I'm familiar with
22 the location of the house. I've physically seen the
23 front of the house from the street.
24 Q. Do you have any explanation as to why Officer
25 Moore didn't knock for the full nine minutes that he

Page 75

1  was investigating the noise violation?
2  A. No, I do not.
3  Q. What then should Officer Moore have done? He's
4  knocking at the door and nobody's answering, what then
5  is the policy and procedure for what a police officer
6  should have done?
7  A. Continue to try to make contact with the owners
8  or the responsible parties.
9  Q. How?
10 A. Through repeated knocks, through potentially
11 calling. And in this case, I know Officer Moore took
12 the action of opening the door and calling out trying
13 to garner their attention.
14 Q. And is it your testimony that Officer Moore's
15 conduct in opening the door to try to get their
16 attention was in compliance with APD policies and
17 procedures?
18 A. It's my testimony that it's not a violation of
19 policy, that's correct.
20 Q. To your knowledge, has there been any other
21 complaints lodged against the City for officers opening
22 doors to citizen's residences?
23 A. I'm not familiar.
24 Q. So you can't say either way, you just don't
25 know?

Page 76

1  A. I don't know.
2  Q. Is there any specialized training, to your
3  knowledge, given to police officers concerning the very
4  issue of when they may or may not open the door of a
5  residence?
6  A. There's specialized training regarding search
7  and seizure.
8  Q. How about more specific to the issue of when
9  they may or may not open the door to a citizen's
10 residence?
11 A. That specific, no.
12 Q. No, you're not aware of any training?
13 A. I'm not aware of any training.
14 Q. Are you familiar with the training enough to
15 know whether there's no training provided on that
16 issue?
17 A. I would defer to the persons who provide that
18 training to answer that question exactly -- to all the
19 specifications of the training. I'm not aware of any
20 training that specific.
21 Q. How about, are you here to testified in any way
22 regarding the use of the deployment of the tazer in
23 this case?
24 A. No, I'm not.
25 Q. Just so I'm clear, was there an investigation of